GRANT G. GARD, DOING BUSINESS AS GARD & COMPANY, APPELLEE, V. PELICAN PUBLISHING COMPANY, APPELLANT.
· 433 N.W.2d 175

Filed December 23, 1988.    No. 86-587.

John H. Cotton, of Gaines, Otis, Mullen & Carta, for appellant.

James Martin Davis for appellee.

HASTINGS, C.J., SHANAHAN, and FAHRNBRUCH, JJ., and RILEY and OTTE, D. JJ.

RILEY, D.J.

Grant G. Gard filed a declaratory judgment action against Pelican Publishing Company for a determination that Pelican had failed to perform its publication agreement with Gard and that Pelican's nonperformance terminated all rights and obligations based on the publication agreement. The district court for Douglas County entered judgment that Pelican's interest in the publication agreement was terminated when Pelican failed to publish Gard's book, "Don't Talk About

It—Do It."

"Whether a declaratory judgment action is treated as an action at law or one in equity is to be determined by the nature of the dispute." *Boren v. State Farm Mut. Auto. Ins. Co.*, 225 Neb. 503, 505, 406 N.W.2d 640, 643 (1987). See, also, *Caeli Assoc. v. Firestone Tire & Rubber Co.*, 226 Neb. 752, 415 N.W.2d 116 (1987).

Gard's action for a declaratory judgment was a law action to determine whether a contract continued to exist when Pelican did not publish Gard's book.

> In a declaratory judgment action, issues of fact "may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending." [See Neb. Rev. Stat. § 25-21,157 (Reissue 1985).] This court has treated the determination of factual issues in a declaratory judgment action which would otherwise be an action at law in the same manner as if a jury had been waived. The findings of the trial court therefore have the effect of the verdict of a jury and will not be set aside unless clearly wrong. [Citation omitted.]

*Larutan Corp. v. Magnolia Homes Manuf. Co.*, 190 Neb. 425, 433, 209 N.W.2d 177, 182 (1973).

Gard is a full-time motivational speaker, conducting seminars in sales and management training. As part of his business and to promote speaking engagements, Gard wrote a book entitled "Don't Talk About It—Do It" in approximately 1974. Gard had copies of the book printed and sold them at his speaking engagements. He also gave complimentary copies of the book to people inquiring about his speaking services. A few books were sold to people in the retail business, such as Amway distributors, who in turn resold the books to their customers. In 1977 and 1980, Gard briefly negotiated with Pelican concerning the possibility of having Pelican publish "Don't Talk About It—Do It," but no agreement was reached.

In 1982, Gard wrote a second book, "Championship Selling." He contacted several publishers, including Pelican, about having it published. Pelican asked Gard to submit the manuscript, which he did on about November 17, 1982.

Pelican and Gard also reopened negotiations on publication of "Don't Talk About It—Do It." The negotiations proceeded rapidly because Pelican expressed a wish to complete the contract in time to include "Don't Talk About It—Do It" in its spring catalog. It appears the deadline was missed, because the book was not included in the spring catalog.

Pelican drafted a contract, which was signed by Milburn Calhoun, the president of Pelican, and forwarded to Gard on December 6, 1982. After reading the contract, Gard had reservations about two provisions. The first provision which he questioned was the provision on future works. Gard drafted a change in the contract to which Pelican consented, as expressed by Calhoun's signature beneath the change.

The second provision stated that Pelican would "[p]ublish ["Don't Talk About It—Do It"] within 3 months of the date it goes out of print." Gard never discussed this provision with anyone at Pelican. Instead, Gard researched the meaning of the term for himself. Based on his research, Gard determined that his book was already out of print, thereby requiring Pelican to publish his book within the next 3 months, and on December 11, 1982, signed the publication agreement submitted by Pelican.

Under the signed contract, Pelican agreed to sell Gard copies of the book at "cost plus 50¢." Gard was strictly forbidden from offering any copies for resale in any market, limiting his sales to his seminars and speaking engagements and to mail orders. Gard agreed to cooperate with Pelican in expediting the production and publication of the book. Gard also agreed to give Pelican "an option on all future works. If the PUBLISHER does not execute a publishing agreement satisfactory to both parties within ninety (90) days of the receipt of the completed manuscript, the AUTHOR is under no further obligation." Lastly, the parties agreed the publishing rights automatically returned to Gard if Pelican failed to publish the book within 18 months after receiving the completed manuscript.

In December 1982, Pelican asked Gard to maintain a record of the number of books he had on hand and to supply the figures to Pelican monthly. These figures were supplied orally

in December 1982, and in writing in January 1983. No other inventory figures were ever supplied by Gard.

In February 1983, the focus shifted to the publication of "Championship Selling." A misunderstanding between Pelican and Gard arose concerning when an agreement for the book's publication had to be completed. Gard understood the deadline was February 18, which was 3 months from submission of the manuscript; Pelican operated under the assumption that the deadline for agreement was March 11, or 3 months after the date the agreement was signed. Through a series of letters in February, the parties agreed Pelican had until March 11 to evaluate "Championship Selling."

Following its evaluation of "Championship Selling," Pelican submitted a proposed contract to Gard on March 10. Gard refused to sign the contract because it contained a clause allowing him to purchase copies of the book at 40 percent off the suggested retail price, rather than the "cost plus 50¢" clause in the "Don't Talk About It—Do It" contract. According to Gard, this clause would make it too costly for him to give away copies to people inquiring about his speaking services or to sell copies at his seminars. Gard informed Pelican that the contract was unacceptable, by a letter dated April 2, 1983. In the letter, Gard stated, "I have made other arrangements to have this book published." The "other arrangements" consisted of a publishing contract with Prentice-Hall entered into in late March of 1983. In May of 1983, Gard determined Pelican was not interested in publishing "Don't Talk About It—Do It." Negotiations for the return of the publishing rights failed to resolve the dispute.

In addition to the declaratory judgment sought in Gard's first cause of action, Gard's second amended petition included a second cause of action, which sought damages for Pelican's breach of the publication contract. Pelican counterclaimed for specific performance on the contract and for damages resulting from the seventh printing of "Don't Talk About It—Do It" and the publication by Prentice-Hall of "Championship Selling" and a third book, entitled, "How to be a Confident and Effective Speaker."

During a bench trial, Pelican's president, Calhoun, testified

that it was important for a publisher to have the existing stocks of an earlier publication removed from the marketplace, such as in bookstores, because "it is confusing to the marketplace if you should have two publishers. . . . They wouldn't know who to order from." Calhoun described "the marketplace" as "[a]nybody who is going to buy a book." Calhoun then testified that, since books are distributed through regular retail markets, publishers want to avoid confusion about the identity of the publisher from which a publication might be obtained.

Other testimony indicated that a book was out of print when a book is unavailable from a publisher.

The district court found that Gard was not a publisher of the book, "Don't Talk About It—Do It," and, therefore, the book was out of print when the contract was signed on December 11, 1982, requiring Pelican, under its agreement with Gard, to publish Gard's book by March 11, 1983. When Pelican failed to publish the book by that date, Pelican breached its agreement with Gard, and Pelican's nonperformance of the publication agreement, under the circumstances, terminated the agreement between the parties. In view of its declaratory judgment regarding Pelican's nonperformance, the district court denied Gard any damages and also denied relief to Pelican on its counterclaim.

On appeal, Pelican's central assignment of error is that the district court erred in finding that Pelican's failure to publish Gard's book was nonperformance which terminated the publication agreement with Gard. All other assignments of error by Pelican hinge upon the correctness of the district court's finding and declaratory judgment that Gard's publication agreement with Pelican had been terminated by Pelican's nonperformance.

The questions before the district court were whether Gard's book, "Don't Talk About It—Do It," was out of print, and, if so, when did the book become "out of print" as such phrase is used in the publication agreement between the parties?

The parties do not dispute that a book is out of print when the book is unavailable from the publisher. If Gard was not a publisher, then his book, "Don't Talk About It—Do It," was unavailable from a publisher and was, therefore, "out of print"

on December 11, 1982, when Gard signed the agreement requiring Pelican to publish his book "within 3 months of the date it goes out of print." However, if Gard was a "publisher" when he signed the agreement on December 11, 1982, then Gard's inventory of his book, "Don't Talk About It—Do It," would have to be exhausted and become unavailable through him in order to start the 3-month period for publication required under Gard's agreement with Pelican. Pelican's president testified that, as far as a "publisher" is concerned, a publication involves distribution "through the regular retail markets [where] somebody goes into a book store . . . ." The record reflects that Gard did not distribute his book through the "regular retail markets," but either gave complimentary copies of his book to people who inquired about his speaking services or sold his book at seminars he conducted. In this manner, Gard used his book, "Don't Talk About It—Do It," solely to enhance his credentials as a speaker. Gard became involved in printing his book as an auxiliary to his main profession—motivational speaking. Gard's books were never sold to bookstores, which were the customers for publishers such as Pelican. It is unlikely Pelican's customers would be confused concerning whether to order from Pelican or from Gard if they had never dealt with Gard before. Further, Pelican understood Gard wished to continue his giveaways and sales at seminars and agreed to allow this practice to continue. By agreeing to allow Gard to continue his personal sales of books purchased from Pelican, Pelican indicated it did not view these sales as creating confusion for its customers.

As a general rule, ambiguous terms in a contract are construed against the party who drafted the contract, *Schmidt v. J. C. Robinson Seed Co.*, 220 Neb. 344, 370 N.W.2d 103 (1985), and are given a construction which the nondrafting party would be fairly justified in giving the term. *Bishop Buffets, Inc. v. Westroads, Inc.*, 202 Neb. 171, 274 N.W.2d 530 (1979).

Pelican drafted the contract in question. While Gard could easily have clarified the matter by asking Pelican to explain what "out of print" meant, Gard was justified in the construction he gave the term. The term should be construed

against Pelican.

The evidence supports the district court's finding that Gard's book, "Don't Talk About It—Do It," was out of print when Gard signed the publication agreement on December 11, 1982. Pelican failed to publish "Don't Talk About It—Do It" by March 11, 1983, 3 months after the contract was signed. By the terms of the contract, the publication rights reverted to Gard when the publication agreement with Pelican was terminated. Pelican has failed to establish that the district court was clearly wrong in its finding of Pelican's nonperformance, resulting in termination with respect to its publication agreement with Gard. The district court's findings and judgment automatically dispose of the other errors assigned by Pelican, since the other assigned errors all presuppose existence of an enforceable contract.

The judgment of the district court is affirmed.

AFFIRMED.