DONALD A. BROCKLEY, APPELLANT, V. LOZIER CORPORATION, A NEBRASKA CORPORATION, APPELLEE.

488 N.W.2d 556

Filed September 11, 1992.   No. S-89-1219.

James F. Kasher and Lauren A. Becker, of Croker, Huck, McReynolds, Kasher & DeWitt, P.C., for appellant.

Frank F. Pospishil and Paul R. Elofson, of Abrahams, Kaslow & Cassman, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

Plaintiff-appellant, Donald A. Brockley, filed an amended petition under the Nebraska Wage Payment and Collection

Act, Neb. Rev. Stat. § 48-1228 et seq. (Reissue 1988) against defendant-appellee, Lozier Corporation, seeking payments allegedly due Brockley under Lozier's incentive plan. The incentive plan payments were allegedly payable after Lozier fired Brockley and Brockley was subsequently employed by the Kent Corporation, a competitor of Lozier. Lozier contends that nothing is due Brockley because Brockley forfeited the right to payments under the incentive plan by competing with Lozier.

The case was tried to the court, which returned a verdict for Lozier and awarded it attorney fees of $25,000 under the wage act. Brockley timely appealed. His 10 assignments of error may be summarized as contending that the trial court erred (1) in finding that Brockley was discharged for cause; (2) in failing to determine that a clause in a deferred compensation plan was unenforceable, for various reasons, where the clause provided for forfeiture of deferred compensation if a discharged employee obtained employment in a business which competed with the employer; (3) in failing to award certain damages to Brockley; and (4) in awarding attorney fees to Lozier and in failing to award attorney fees to Brockley under § 48-1231. We reverse, and remand with directions.

Lozier manufactures and distributes store shelving, fixtures, and accessories. Brockley began work as vice president of marketing for Lozier approximately November 1, 1980. Brockley's original terms of employment included a base salary of $45,000, bonuses, participation in Lozier's pension plan, and an opportunity to purchase up to 1,000 shares of Lozier stock. The terms of employment did not contain any restrictive covenants or possible forfeiture of deferred compensation.

Brockley and Lozier negotiated regarding the stock option, but Brockley was never given the opportunity to purchase any Lozier stock. By 1981, Brockley understood that the majority owner of the company wanted to restructure the company and convert it to a subchapter S corporation and that therefore he did not want to offer any further stock options. Brockley testified that there was some discussion about providing an alterative that "would be equal in benefit over the future years to the stock option."

In June 1982, Lozier offered Brockley the opportunity to

participate in the Lozier Corporation 1982 Long-Term Incentive Plan. Lozier explained that participation in the plan was in substitution for the stock option. Brockley objected, but participated in the plan, effective June 8, 1982, as shown in a written "Performance Unit Agreement" executed by Lozier and Brockley. That agreement stated that Brockley was awarded 100 performance units.

Brockley characterized himself as being in the second tier of management at Lozier. He testified that he was involved in all marketing decisions and some sales decisions and that he supervised the preparation of confidential 1-year marketing plans for Lozier. Brockley testified that he worked on a 3-year plan for 1984-87, although he was not sure it was finished before he was fired. Lozier gave Brockley a 6- to 7-percent raise on January 21, 1984, effective November 1, 1983. Brockley's supervisor, Dennis Monaghan, testified that as of January 12, 1984, when he wrote Brockley's annual review, the criticism of Brockley's job performance did not rise to a level sufficient to justify dismissal. Monaghan testified that he had no knowledge of misconduct on Brockley's part and that he was not involved with Brockley's firing.

Brockley's annual bonuses were part of his annual salary and were calculated using a performance factor. The maximum bonus allowed was 50 percent of base salary. For the fiscal year ending January 31, 1982, Brockley earned a bonus equal to 35 percent of his salary. For the fiscal year 1983, Brockley earned a bonus of 45.7 percent of his salary. For the fiscal year ending January 31, 1984, Brockley earned a bonus equal to 61.32 percent of his salary, which was limited by the 50-percent maximum. Three months later, Lozier terminated Brockley's employment.

As stated above, Brockley also participated in the incentive plan for Lozier executives by executing a "Performance Unit Agreement." A committee made up of some of the members of the board of directors administered the plan. The committee had full discretion in the determination of awards, but also considered the recommendations of the chief executive officer, the "functions and responsibilities of the employee, the employee's potential contributions to the profitability and

sound growth of the Company and such other factors as the Committee deems relevant."

The plan provided that the committee would grant certain employees "Performance Units," which would be credited to a "Performance Unit Account." At the end of each fiscal year, Lozier

> credited to each participant an incentive award . . . based upon that amount . . . which bears the same ratio to the Company's net income (as hereinafter defined) as the aggregate number of Performance Units credited to such participant's Performance Unit Account as of such last day bears to the total number of shares of the Company's common stock issued and outstanding on such last day
> . . . .

These amounts were credited to the employee's "Incentive Award Account."

The amounts in the incentive award accounts were to be paid in cash to the employee "upon the expiration of four years from the end of the fiscal year for which such award is made." The fiscal year at Lozier ran from February 1 through the end of January.

The incentive plan contained the following provision providing for forfeiture of benefits:

> 9. Forfeiture. Until such time as the full amount of his Incentive Award has been actually paid to a participant, his right to receive any unpaid amount thereof shall be wholly contingent and shall be forefeited [sic] if (a) the participant's employment is terminated by the Company because of his involvement in any embezzlement or theft, because of his intentional misconduct or for any other sufficient cause, as determined by the Committee, or (b) prior to the payment thereof, at any time subsequent to the termination of the participant's employment with the Company or any affiliated corporation, he shall do any act or engage, directly or indirectly, whether as owner, partner, officer, employee or otherwise, in the operation or management of any business which shall be in competition with the Company or any affiliated corporation.

Lozier's employment contracts for sales managers and salespeople contained covenants not to compete, limited to 1 year and to the territory that the salesperson had served. The parties stipulate that no high-level management employees had a covenant not to compete, although all high-level management employees had the same forfeiture provisions in their incentive plans.

In January 1984, Lozier reorganized its management. Brockley's immediate supervisor, Monaghan, became vice president of administration, and Wayne Moeller took over Monaghan's former position as vice president of sales and marketing. On approximately April 24, 1984, Lozier, acting through Moeller, terminated Brockley's employment.

Brockley testified that Moeller came to Brockley's office in the early evening and fired him, explaining that

> this was the hardest thing that he ever had to do at Lozier and that I [Brockley] was a hard worker and very dedicated and committed to the company, but he felt that Lozier no longer needed my services, that he was going to run the marketing area differently and was going to reorganize and I really didn't fit into his plans.

Brockley testified that Moeller had said nothing about unsatisfactory job performance, nor had anyone mentioned a problem in the preceding months. Brockley testified that he did not discover until he brought this lawsuit that he had allegedly been terminated for poor performance.

Moeller testified that he "sat down with Don and told him I didn't think it was going to work out." Moeller did not testify that he told Brockley he was being fired for poor performance, but he testified that they discussed some problems. Moeller admitted that Brockley had not been guilty of any misconduct. Moeller testified that he believed a more "hands-on" style of management was needed. Brockley stated that he believed in more delegation of authority than Moeller did.

The evening his employment was terminated, Brockley volunteered to remain with the company for a few months to finish up projects he was working on and to try to find a new job, but Moeller refused, saying that he did not want anyone to accuse Brockley of taking information with him when he left.

Moeller took Brockley's keys and escorted him to the door. Moeller allowed Brockley to return later for his personal effects, but remained in the room while Brockley was cleaning out his desk and inspected all items that Brockley took with him.

Moeller wrote Brockley a letter providing for salary and insurance through August 31, 1984, and providing for $7,500 in lieu of a bonus for the fiscal year ending in 1985. The letter contained the notation that "[a]ny and all parts of the above program remaining unpaid will be automatically cancelled by the following: A) Employment by a company deemed by Lozier to be a competitor. B) Disclosure to others of confidential information gained while employed by Lozier." The severance agreement made no mention of the incentive plan.

In May 1984, Brockley began working for Watkins Manufacturing Company, a California company, which was not a competitor of Lozier. Brockley remained with Watkins for about a year and then voluntarily left because he believed Watkins was about to be acquired by a larger corporation.

The Kent Corporation approached Brockley in late 1984 or early 1985 about the possibility of his becoming president of Kent. Kent was a competitor of Lozier in store fixtures, but did not manufacture storage shelving. While at Lozier, Brockley had little contact with customers other than those seeking storage shelving. In April 1985, Brockley visited Kent in Alabama. In July 1985, Brockley accepted employment as president of Kent. Brockley's compensation at Kent included a base salary of $110,000, with bonuses and other benefits. Kent is a smaller corporation than Lozier, with net sales of $8 to $9 million annually, while Lozier's sales were $125 to $150 million. Kent's manufacturing plant is located in Birmingham, Alabama. Lozier has a manufacturing plant in Scottsboro, Alabama. Kent sells only store fixtures. Kent did business nationwide, but over 90 percent of Kent's business was east of the Mississippi.

Brockley testified that he competed against Lozier, as well as "all the other eight or nine or ten people that were in the business," and Brockley testified that he solicited an employee of Lozier, Robert Leech, to work for Kent. Leech was made vice

president of sales and marketing for Kent. While with Kent, Leech solicited customers that he had previously done business with when he was working for Lozier.

Brockley assisted Leech with the solicitations. Brockley testified that Kent had solicited many of these same customers before Brockley was employed by Kent. During the time Brockley was with Kent, Lozier solicited and took customers from Kent, including one of Kent's larger customers.

Monaghan testified that he did not have any personal knowledge that Brockley's activities personally led to Lozier's losing accounts and that he did not have any knowledge that Brockley "utilized any specific information from Lozier Corporation in targeting accounts that might have been lost to Kent."

On August 28, 1985, and February 26, 1986, Lozier informed Brockley that he had forfeited his right to unpaid benefits "because [he] acted and engaged as an officer and employee in the operation or management of a business in competition with Lozier Corporation."

Both parties agree that the amounts that would be distributed to Brockley, absent the forfeiture, are $28,953.93, payable January 31, 1987, and $35,030.18, payable January 31, 1988. Brockley left Kent in approximately July 1986, after about a year of employment, after which he returned to Omaha to work as president of Industrial Electrical Reels.

Lozier did not contend in its answer that Brockley was terminated for cause, but, rather, first mentioned termination for cause in a motion for leave to amend the answer on June 15, 1988, after Brockley had moved for summary judgment. Lozier moved that the court transfer the case to its equity docket "as it is an equity action seeking both declaratory relief and an accounting." The court granted the motion.

The trial court entered judgment for Lozier, setting out the following findings:

> The court further finds that the forfeiture clause in the incentive plan is not a covenant not to compete, but merely provides forfeiture of post employment benefits.
>
> The court further finds that the forfeiture clause is reasonable and enforceable considering:

1. Plaintiff, as vice president of marketing for defendant, was privy to extremely confidential information regarding defendant's operations which defendant had a legitimate interest in protecting from disclosure to defendant's competitors.

2. The effective term of restriction, i.e. four years, was not of unreasonable duration.

3. Lack of geographical restriction was reasonable considering defendant's market encompassed national and international sales.

4. Plaintiff was not prohibited from earning a livelihood, but merely forfeited a delayed incentive payment.

The court further finds plaintiff was discharged for cause, i.e. unsatisfactory job performance.

Lozier moved for attorney fees under § 48-1231, and the court awarded Lozier fees in the amount of $25,000. Brockley's motion for new trial was overruled.

In all appeals from the district court in suits in equity in which review of some or all of the findings of fact of the district court is asked by the appellant, it shall be the duty of the Court of Appeals or the Supreme Court to retry the issue or issues of fact involved in the finding or findings of fact complained of upon the evidence preserved in the bill of exceptions and, upon trial de novo of such question or questions of fact, reach an independent conclusion as to what finding or findings are required under the pleadings and all the evidence without reference to the conclusion reached in the district court or the fact that there may be some evidence in support thereof.

Neb. Rev. Stat. § 25-1925 (Supp. 1991).

The initial question is whether Brockley was fired for cause. "In the context of employment contracts, 'good cause' for dismissal is that which a reasonable employer, acting in good faith, would regard as good and sufficient reason for terminating the services of an employee, as distinguished from an arbitrary whim or caprice." *Stiles v. Skylark Meats, Inc.*, 231 Neb. 863, 865, 438 N.W.2d 494, 496 (1989).

We find that the evidence does not support the finding that

Brockley was fired for cause. Both Monaghan and Moeller testified that Brockley had not been guilty of any misconduct. Monaghan testified that when he was Brockley's immediate superior, which was for the vast majority of Brockley's tenure at Lozier, Brockley had done nothing to constitute cause for firing. Brockley received raises, bonuses, and good reviews throughout his tenure at Lozier, up to within 3 months of his discharge. Brockley was not told at the time he was fired, nor at any time prior to this litigation, that he was being fired for poor performance. The issue of poor performance arose for the first time in a motion to amend Lozier's answer, which was filed after Brockley had moved for summary judgment.

In addition, Lozier's conduct was inconsistent with its contention that it fired Brockley for cause. Clause 9 of the incentive plan provides that if a participant's employment is terminated for cause, his right to receive payments is forfeited. Lozier, however, did not make the contention that Brockley's rights were forfeited until the time Brockley engaged in competition with Lozier. Lozier's handling of Brockley's claim for partial year payments under clause 8 is also inconsistent with its claim that Brockley was terminated for cause. Under clause 8(b), an employee fired for cause would have no right to partial year payments. Monaghan's April 23, 1985, memo to Moeller stated that under clause 8(b), Brockley would be paid for 27 percent of the year. Monaghan later testified that when he wrote the memo he was mistaken about whether Brockley had been awarded performance units, but he specifically testified that the memo was correct in its discussion of clause 8(b). Under clause 8(b), if Lozier fired Brockley for cause, Brockley would not be entitled to any partial year payments regardless of whether performance units had been awarded.

On consideration of the entire record, we find that Lozier did not fire Brockley for cause and that there is no substantial evidence to support such a finding. The trial court's finding was in error.

Next, we must decide the circumstances under which a forfeiture for competition clause will be enforced. Lozier contends that the clause is not a covenant not to compete and that it should therefore be enforced, regardless of whether it is

reasonable. We recognize that the clause in question is not a covenant not to compete, but do not agree with the contention that a forfeiture clause need not be reasonable.

We adopt the view set out by the Minnesota Supreme Court in *Harris v. Bolin*, 310 Minn. 391, 395, 247 N.W.2d 600, 603 (1976), where the court held that a forfeiture for competition clause was an unlawful restraint of trade because it was not limited "as to time, harm to the employer, or geographical area." The Minnesota court noted that while other courts had

attempted to distinguish between covenants not to compete in employment contracts and the penalty imposed under profit sharing plans for competing, the purpose of both arrangements is the same; therefore, under the common law, such agreements should be enforced only when they are found to be reasonable in scope after balancing the interests of the employer and employee.

*Id.* at 394, 247 N.W.2d at 603. See, also, *Food Fair Stores v. Greeley*, 264 Md. 105, 285 A.2d 632 (1972); *Holloway v. Faw, Casson & Co.*, 319 Md. 324, 572 A.2d 510 (1990); *Sheppard v. Blackstock Lumber*, 85 Wash. 2d 929, 540 P.2d 1373 (1975); *Cheney v. Automatic Sprinkler Corp. of America*, 377 Mass. 141, 385 N.E.2d 961 (1979).

The concept of forfeiture of deferred compensation based on competitive employment after discharge has not been squarely before this court. Over the years, however, we have established that covenants not to compete are enforceable if the covenants are reasonable. We will apply the same analysis to forfeiture of deferred compensation. Our position on covenants not to compete was summed up in *Boisen v. Petersen Flying Serv.*, 222 Neb. 239, 383 N.W.2d 29 (1986), where we quoted, with approval, the holding of *Securities Acceptance Corp. v. Brown*, 171 Neb. 406, 106 N.W.2d 456 (1960):

"There are three general requirements relating to [the enforceability of] partial restraints of trade: First, is the restriction reasonable in the sense that it is not injurious to the public; second, is the restriction reasonable in the sense that it is no greater than is reasonably necessary to protect the employer in some legitimate interest; and, third, is the

restriction reasonable in the sense that it is not unduly harsh and oppressive on the employee."

*Boisen*, 222 Neb. at 244, 383 N.W.2d at 33.

In *Polly v. Ray D. Hilderman & Co.*, 225 Neb. 662, 407 N.W.2d 751 (1987), we extended our holding. Polly's contract with the defendant, Hilderman, plaintiff's former employer, provided that if plaintiff competed with defendant within a certain area, " 'all deferred bonus payments due [plaintiff] shall forthwith terminate. . . .' " *Id*. at 664, 407 N.W.2d at 754. We held that it was unclear whether the agreement was a covenant not to compete, but we went on to find that the agreement was unreasonable, applying a reasonableness requirement to the agreement as if it were a covenant not to compete.

We find that forfeitures of deferred compensation are enforceable, but that they will be treated in the same manner as covenants not to compete, and therefore, the conditions making the forfeitures enforceable must be reasonable.

The forfeiture provision in Brockley's incentive plan contract is unenforceable because it is unreasonable. If Brockley participated in the plan for the fiscal year ending January 1985, his last payment from Lozier would have been in January 1989. Brockley left Lozier in April 1984. The forfeiture for competition clause would require that Brockley not work for a competitor for almost 5 years after he was fired. Brockley contends that the forfeiture clause is unreasonable because 4 to 5 years is an unreasonably long duration. We agree.

" '[A]n employer has a legitimate business interest in protection against a former employee's competition by improper and unfair means, but is not entitled to protection against ordinary competition from a former employee.' " *Id*. at 665, 407 N.W.2d at 754. " '[A] restraint is reasonable only if, taken as a whole, its dimensions are proportioned in relation to each other so as to keep the burden on the employee down to the minimum consistent with reasonable protection to the employer's legitimate interests.' " *American Sec. Servs. v. Vodra*, 222 Neb. 480, 489, 385 N.W.2d 73, 79 (1986).

In considering the requirements for a valid partial restraint of trade referred to in *Boisen, supra*, and *Polly, supra*, we focus

on the second requirement: Is the restriction reasonably necessary to protect a legitimate interest of the employer? Nebraska cases dealing with former employees who appropriated customer goodwill are not directly apposite in the case before us. Brockley had no contact with customers except in the storage shelving department, an area in which Kent did not compete with Lozier. Brockley's danger to Lozier consisted of his knowledge of confidential information.

Employers, however, have a legitimate interest in protecting confidential information. We held:

> [A]n employer has a legitimate need to curb or prevent competitive endeavors by a former employee who has acquired confidential information or trade secrets pertaining to the employer's business operations. . . . Ordinarily, an employer has no legitimate business interest in postemployment prevention of an employee's use of some general skill or training acquired while working for the employer, although such on-the-job acquisition of general knowledge, skill, or facility may make the employee an effective competitor for the former employer.

*Boisen*, 222 Neb. at 246-47, 383 N.W.2d at 34. See, also, *Chambers-Dobson, Inc. v. Squier*, 238 Neb. 748, 472 N.W.2d 391 (1991). We went on in *Boisen* to determine that the employer had not shown that the employee possessed any confidential information.

In the case before us, Lozier has shown that Brockley had knowledge of and access to "confidential information pertaining to Lozier's business operations." Indeed, Brockley admits that he had access to confidential information. Lozier has not shown, however, that there was still a need to protect that information almost 5 years after Brockley's firing. The evidence shows that, at best, Brockley may have worked on parts of Lozier's 3-year plan. There is no showing of a need to protect information 4 to 5 years after it was developed. The evidence does not show the useful life of the confidential information, but merely supports the general proposition that companies would like to keep everything secret forever. The confidential information available to Brockley, in the second

tier of management, could not be said to be of such a nature as to require protection lasting for many years. While Lozier has shown a legitimate interest, it has not shown that a 4-year restriction was reasonably necessary to protect it.

Because we hold that the forfeiture clause contains an unreasonable duration requirement, we need not consider whether the other requirements are reasonable. The forfeiture clause is unenforceable. We will not reform an unreasonable forfeiture of deferred compensation to make the forfeiture enforceable.

> In previous cases of this nature, we have declined, for various reasons, to rewrite a covenant not to compete so as to make it "no greater than is reasonably necessary." . . . It is not the function of courts to reform unreasonable covenants not to compete solely for the purpose of making them legally enforceable.

*Vlasin v. Len Johnson & Co.*, 235 Neb. 450, 455, 455 N.W.2d 772, 776 (1990). Brockley's second summarized assignment of error has merit. The forfeiture clause in Lozier's incentive plan is not enforceable against Brockley.

In his third summarized assignment of error, Brockley contends that the court erred in failing to find that he was entitled to an incentive award for the portion of the fiscal year ending in 1985. Lozier's fiscal year ends January 31. Brockley was fired near the end of April, so he worked approximately 3 months of the fiscal year in question.

We look first to the language of the incentive plan agreement itself. The plan provided that the committee would grant certain employees performance units, which would be credited to a performance unit account. At the end of each fiscal year, Lozier

> credited to each participant an incentive award . . . based upon that amount . . . which bears the same ratio to the Company's net income (as hereinafter defined) as the aggregate number of Performance Units credited to such participant's Performance Unit Account as of such last day bears to the total number of shares of the Company's common stock issued and outstanding on such last day . . . .

These amounts were credited to the employee's incentive award account. The amounts in the incentive award accounts were to be paid in cash to the employee "upon the expiration of four years from the end of the fiscal year for which such award is made."

In regard to payments for partial years worked, the plan contained the following clause:

8. Termination of Employment. . . .

(b) If a participant's employment is terminated by the Company for any reason except his involvement in any embezzlement or theft, his intentional misconduct or any other sufficient cause, as determined by the Committee, then on the last day of the taxable year in which such termination occurs the Committee shall determine the amount of the Incentive Award which would be credited to the participant if he had remained in the employment of the Company through the last day of such taxable year, and he shall be credited with such proportion of that amount as the number of full weeks of his employment by the Company during such year bears to 52.

Brockley contends that the performance units were awarded like shares of stock, and once an employee had the units, he kept them. Every year, the committee would calculate how much the units were going to pay for that year. This is the more reasonable interpretation if the incentive plan was, as Lozier admits, a substitute for stock ownership. When asked whether he understood the incentive plan, Brockley responded:

I also understood that when I was awarded 100 performance shares it was like the stock, that they belonged to me and that this wasn't awarded every year. There was never any discussion that maybe in a given year where I performed real well the compensation committee would decide maybe they wouldn't give me anything. I sure didn't understand that.

Lozier prepared the incentive plan contract.

In construing a contract, the court will apply the general rule that when there is a question as to the meaning of the language of a contract, the contract will be construed against the party preparing it. . . . If the language in a

contract drafted by one of the parties is susceptible to more than one meaning, it should be given a construction which the other party would be fairly justified in giving it. *Artex, Inc. v. Omaha Edible Oils, Inc.*, 231 Neb. 281, 287, 436 N.W.2d 146, 150-51 (1989). See, also, *Gard v. Pelican Publishing Co.*, 230 Neb. 656, 433 N.W.2d 175 (1988).

Based on the language of the incentive plan agreement, we adopt Brockley's interpretation. When coupled with the rule that ambiguous contracts are construed against the drafter, we are persuaded that Brockley's interpretation is correct.

In addition, the course of performance between the parties indicates that Brockley's interpretation is correct. " 'It is well-established law in this state that the interpretation given to a contract by the parties themselves while engaged in the performance of it is one of the best indications of true intent and should be given great, if not controlling, influence.' " *International Harvester Credit Corp. v. Lech*, 231 Neb. 798, 803, 438 N.W.2d 474, 478 (1989). See, also, *Wurst v. Blue River Bank*, 235 Neb. 197, 454 N.W.2d 665 (1990).

Lozier explained that participation in the plan was in partial substitution for the stock option. A memo written by Monaghan compared the benefits of the stock option and the incentive plan. Monaghan testified that Lozier intended to "create a balance between a stock option or the ownership of stock and involvement in the long-term incentive plan."

In addition, Lozier did not notify the employees every year that they had been "awarded units." Monaghan admitted that the board did not always give notice to the employees when they had been given performance units, but that it "was a matter of board record." Each year, Lozier notified Brockley of the units' worth, but he testified that he never "received notice of receiving any performance units" after the original award of 100 units and that he believed he owned the 100 units from the time they were awarded in 1982. Monaghan testified to a similar experience. He testified that he participated in the incentive plan and that he had received notice the first time he received units, but that he did not receive notice every year, although he had participated in the plan every year. It is difficult to believe that Lozier would not notify the employees about whether they

were to participate in a plan worth roughly half their base salary, yet would notify them regarding what the units were worth in a particular year.

In addition, Moeller wrote a memo to Monaghan and another of Brockley's superiors, dated April 25, 1984, containing the details of the termination of Brockley's employment. It included this notation: "Don indicated that he would probably want pay out of the performance units. $ because 'He'd need the money.' Although less expensive to us re interest payment premium I would favor a staggered payout as assurance of non-compete. Thoughts?"

Monaghan wrote Moeller a memo, dated April 23, 1985, which stated that Brockley was due only 27 percent of the performance shares for the year in which he was fired, because he had worked only 27 percent of the year. The memo stated that "Clause 8(b) of the agreement covers this situation. In essence it says you get paid for the portion of the fiscal year that you worked."

Neither the agreement itself nor the parties' performance of it supports Lozier's contention that Brockley is not entitled to payment for 100 performance units for the portion of the fiscal year ending in 1985 that he worked. In the trial court's calculation of damages, Brockley is entitled to amounts under the incentive plan for the time he worked during the fiscal year ending on January 31, 1985.

In his fourth summarized assignment of error, Brockley contends that the court erred in failing to award attorney fees and costs to him and in making an award of fees and costs to Lozier. Brockley contends that the sums owing under the incentive plan are earnings, compensation, or wages under the Nebraska Wage Payment and Collection Act. Lozier states that "[u]nder the [wage] act, the legislature has made the risk of proceeding with litigation reciprocal to both the employer and the employee." Brief for appellee at 36. Lozier defends the trial court's award of attorney fees to Lozier and seeks the award of fees in this court. Both parties agree that the wage act controls, and the case has been submitted on that basis. The Nebraska Wage Payment and Collection Act states, in part:

An employee having a claim for wages which are not

paid within thirty days of the regular payday designated or agreed upon may institute suit for such unpaid wages in the proper court. If an employee shall establish a claim and secure judgment on the claim, such employee shall be entitled to recover (1) the full amount of the judgment and all costs of such suit, and (2) if such employee has employed an attorney in the case, an amount for attorney fees assessed by the court which fees shall not be less than twenty-five percent of the unpaid wages. If the cause is taken to an appellate court and plaintiff shall recover judgment, the appellate court shall tax as costs in the action, to be paid to the plaintiff, an additional amount for attorney fees in such appellate court which fees shall not be less than twenty-five percent of the unpaid wages. If the employee shall fail to recover a judgment in excess of the amount that may have been tendered within thirty days of the regular payday by an employer, then such employee shall not recover the attorney fees provided by this section and shall pay the employer's attorney fees and costs of the action as assessed by the court.

§ 48-1231.

With regard to the award of attorney fees under § 48-1231 to Lozier, Brockley contends that because Lozier never "tendered" any amount "within thirty days of the regular payday," the award of attorney fees to Lozier was improper.

Because of our disposition of the case, it is clear that the award of attorney fees to Lozier must be reversed as well. We note, however, that even had Lozier been successful on appeal, the award of attorney fees to Lozier, the employer, in either the trial court or this court, was clearly contrary to the statute. Employers will not be awarded attorney fees under the Nebraska Wage Payment and Collection Act if the employer has not tendered an amount to the employee within 30 days of the employee's regular payday.

We hold that the award of fees to Lozier was inappropriate, and that award is reversed.

The cause is remanded to the district court to enter a judgment in favor of Brockley and against Lozier for the incentive awards for the years ending January 31, 1983, and

January 31, 1984, plus 27 percent of the incentive award for the year ending January 31, 1985. The trial court shall also calculate interest on the incentive awards at the rates set out in exhibit 22, plus the appropriate rate for the partial year ending January 31, 1985.

In addition, Brockley is awarded attorney fees and costs, pursuant to the statute. The trial court is directed to enter an attorney fee of 25 percent of the incentive awards (including interest as set in paragraph 7 of the incentive plan) as appellate attorney fees in this court, and the court is directed to enter appropriate attorney fees under § 48-1231 as fees in the trial court.

REVERSED AND REMANDED WITH DIRECTIONS.