Louis J. CAPOZZI, Jr., Appellee,

v.

LATSHA & CAPOZZI, P.C., Kimber L. Latsha, Glenn R. Davis and Douglas C. Yohe, Appellants.

Superior Court of Pennsylvania.

Argued Feb. 13, 2002.

Filed April 9, 2002.

Richard H. Wix, Harrisburg, for appellants.

John M. Cramer, Harrisburg, for appellee.

Before ORIE MELVIN, KLEIN, and OLSZEWSKI, JJ.

OLSZEWSKI, J.

¶ 1 Appellants Latsha & Capozzi, P.C.; Kimber L. Latsha; Glenn R. Davis; and Douglas C. Yohe appeal from the trial court's February 27, 2001, order granting appellee Louis J. Capozzi, Jr.'s post-trial motion for judgment notwithstanding the verdict, and awarding him a new trial on the specified issue of damages. For the following reasons, we affirm.

¶ 2 The trial court aptly summarized the facts of the case as follows:

In 1994, Louis Capozzi and Kimber Latsha worked as attorneys for the

Cumberland County law firm Shumaker & Williams. They left Shumaker & Williams, and on May 23, 1994, incorporated Latsha & Capozzi, a professional corporation for the practice of law. Capozzi and Latsha took [several] of Shumaker & Williams' clients with them. In July, 1994, Douglas Yohe left Shumaker & Williams to become a shareholder in Latsha & Capozzi. In 1994, Latsha & Capozzi, P.C. had gross revenues of approximately $300,000. In March 1995, Glenn Davis left Shumaker & Williams to become a shareholder in Latsha & Capozzi. He also brought some of Shumaker & Williams' clients with him. Once Davis became a shareholder, Latsha and Capozzi [Capozzi and Latsha] owned 37 1/2 percent of the stock in Latsha & Capozzi P.C., with Yohe owning 15 percent and Davis owning 10 percent. By the end of 1996, Latsha & Capozzi P.C. had 15 attorneys and gross revenue for the year of $2.6 million.

In January 1997, Latsha, Yohe, and Davis became concerned about the conduct of Capozzi, which they felt was injurious to the reputation of the law firm. They attributed Capozzi's conduct to the abuse of alcohol. On May 2, 1997, the three shareholders of the firm and others conducted an intervention in an effort to have Capozzi enter the Caron Foundation for treatment. On the same date, the board of directors reduced Capozzi's $175,000 annual salary to $100,000 a year. [footnote omitted]. On May 5, Capozzi undertook inpatient treatment at the Caron Foundation. He completed that treatment on May 19. On June 2, the board of directors suspended Capozzi's employment without pay. On June 6, Capozzi was notified in writing that he could return to employment with the firm for an open probationary period subject to 13 conditions.

Capozzi did not accept the conditions and his employment with the firm terminated. On June 11, Capozzi started his own law firm, Capozzi Associates, in Harrisburg, Dauphin County.

Capozzi's legal specialty is representing medical care providers, who seek higher reimbursements than have been paid by government and other entities to the providers for services rendered to patients. Latsha & Capozzi P.C. billed clients based on written fee agreements of hourly rates for the shareholders and associates in the firm. In 1996, having become more adept at representing the firm's medical providers, Capozzi sought to switch to value billing. The board of directors rejected the proposal. Notwithstanding, Capozzi arbitrarily increased the time billed to 66 clients from the actual time that associates had worked on behalf of those clients. The law firm discovered these overbillings, which were in violation of the firm's written fee agreement with those clients, shortly before Capozzi's employment ended on June 6, 1997. The firm had an audit conducted and determined that the 66 clients had been overbilled by Capozzi. In July and August, 1997, Latsha & Capozzi P.C., returned to each of the 66 clients the amount of money that Capozzi had overbilled that client. When the money was returned, the firm informed each client that it had determined that there was an over-billing, but it did not advise the clients of the reason why.

In May 1997, Capozzi generated a complete client list from the firm's computer base. When he started Capozzi Associates on June 11, 1997, he took many of the clients of Latsha & Capozzi P.C., with him, some of which were among the 66 clients the firm returned money to because of his overbillings. Capozzi solicited some of these clients

before his employment ended on June 6, 1997, and sent them release forms. Capozzi Associates now has nine attorneys.

When Latsha and Capozzi incorporated their law firm, they had an oral agreement that if either of them left the firm, [or] competed with the firm, that shareholder would receive for his stock the amount of his capital contribution in the professional corporation. When Yohe became a shareholder, he entered [ ] a similar oral agreement with Latsha and Capozzi. When Davis became a shareholder, he too entered [ ] a similar oral agreement with Latsha, Capozzi, and Yohe. Latsha & Capozzi P.C. never had a written shareholders' agreement. The shareholders at times talked about entering [ ] a written agreement, and numerous drafts were circulated, but they were never acted upon. [FN5. Louis Capozzi testified that there were never any oral agreements among the shareholders to govern dissolution.]

¶ 3 Trial Court Opinion and Order, 2/27/01, at 4–7, *Capozzi v. Latsha & Capozzi, P.C.,* 50 Pa. D. & C.4th 489 (Pa. Com.Pl.2001). Appellee asserted, in his post-trial motion for relief, the oral agreement that the jury found existed amongst the shareholders of Latsha & Capozzi, P.C., restricted his right as a lawyer to practice law after his termination and is unenforceable as a violation of public policy. *Id.* at 7. As stated in the facts above, the oral agreement required that if a shareholder left the firm, and then competed with the firm, that shareholder's stock would be valued at his capital contribution, namely, five-thousand dollars ($5000.00). In support of his public policy argument, appellee relied on Rule 5.6 of the Rules of

Professional Conduct adopted by the Supreme Court of Pennsylvania. The rule states in pertinent part:

> A lawyer shall not participate in offering or making:
>
> (a) "a partnership, shareholders, operating, employment or other similar type of agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement . . . ." (emphasis added)

*Model Rules of Prof'l Conduct R. 5.6.* The trial court concluded, based on our Supreme Court's disposition in *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 602 A.2d 1277 (1992), that appellee could not rely on the Rules of Professional Conduct, alone, to create or substantiate a basis for relief.[1] The trial court found, however, that as a matter of public policy, "attorneys who are shareholders of a professional corporation may enter into an enforceable agreement that reasonably prevalues the stock of a departing shareholder who then competes with the law firm." Trial Court Opinion and Order, 2/27/01, at 18. The court continued, however, and held that such agreements must comply with the standards for a restrictive covenant set forth by our Supreme Court. *Id.* In the case *sub judice,* the trial court found the shareholders' forfeiture clause failed to meet that standard, as overbroad in both time and geographical scope. *Id.* The trial court, therefore, held that appellee is entitled to judgment notwithstanding the verdict on liability and ordered a new trial on damages to determine the value of his stock. *Id.* at 21. This timely appeal followed.

---

1. In *Maritrans* our Supreme Court held, "[t]he Superior Court correctly recognized that simply because a lawyer's conduct may violate the rules of ethics does not mean that the conduct is actionable, in damages or for injunctive relief." 529 Pa. at 254, 602 A.2d at 1284.

¶ 4 Appellants raise five (5) issues for our review:

A. Did the trial court err when it held that the shareholders valuation agreement is equivalent to an employment contract and that the validity by which it is to be judged is the standard applicable to restrictive covenants?

B. Did the trial court err when it held that the valuation provision was unenforceable because it was not reasonably limited in both time and territory?

C. Did the trial court err in holding that Plaintiff was not equitably estopped from attacking the enforceability of the valuation agreement?

D. If it is determined as a matter of law that there was no valid oral agreement, is [appellee] entitled to any monetary recovery for the value of his shares in the Professional Corporation?

E. If there is an exception to the Professional Corporation Law which allows a shareholder who is wrongfully excluded from a professional corporation to collect damages, should any factual disputes over the circumstances of the termination be determined by the jury?

Brief for Appellant at 4.

¶ 5 We begin with our standard of review. The decision whether to grant a new trial lies within the trial court's sound discretion. *Martin v. Evans*, 551 Pa. 496, 501–02, 711 A.2d 458, 461 (1998). Therefore, when reviewing an order granting or denying a motion for a new trial, we must determine whether the trial court "clearly and palpably abused its discretion or committed an error of law which affected the outcome of the case." *Whyte v. Robinson*, 421 Pa.Super. 33, 617 A.2d 380, 382 (1992).

¶ 6 Appellants' first issue argues that the trial court erred in construing the oral shareholders' valuation agreement as an employment contract and, as such, in-

correctly applied the standard for judging restrictive covenants. Brief for Appellant at 9. Our case law reveals that covenants not to compete do not need to be found specifically in an employment agreement for our standard to apply. *Wainwright's Travel Service, Inc. v. Schmolk*, 347 Pa.Super. 199, 500 A.2d 476, 477 (1985). In *Wainwright*, we held that it is only necessary that a restrictive covenant be ancillary to another agreement incident to an employment relationship between the parties. *Id.* at 478. The covenant in *Wainwright* was found in a stock purchase agreement. *See id.* In that case, we reviewed the covenant to determine if it was reasonably necessary, supported by consideration, and limited in time and geographical scope. *Id.* (citations omitted). We disagree with appellant that our standard should differ, or not apply, because we are reviewing a covenant in a shareholders' agreement. New Jersey courts have spoken directly to this issue and held "a covenant not to compete, [ ] otherwise reasonable, will not be denied enforcement merely because it is included in a partnership agreement." *Creter v. Creter*, 52 N.J.Super. 197, 145 A.2d 149, 154 (1958). Appellants' argument is unfounded.

¶ 7 Finding that the Latsha & Capozzi, P.C., valuation agreement created a form of a restrictive employment covenant, the trial court held that attorneys could be subject to such covenants in Pennsylvania. Trial Court Opinion and Order, 2/27/01/ at 18. The trial court adopted its reasoning from the California Supreme Court's case *Howard v. Babcock*, 6 Cal.4th 409, 25 Cal. Rptr.2d 80, 863 P.2d 150 (1993). We agree with the California Supreme Court and, further, adopt its reasoning and rationale.

¶ 8 The facts of *Howard* are analogous to this case where four (4) general partners left a law firm to open a competing firm. *See id.* The general partners were

subject to the firm's partnership agreement, which provided, in pertinent part:

[s]hould more than one partner, associate or individual withdraw from the firm prior to age sixty-five (65) and thereafter within a period of one year practice law ... together or in combination with others, including former partners or associates of this firm ... within Los Angeles or Orange County Court system, said partners or partners shall be subject ... to forfeiture of all their rights to withdrawal benefits other than capital as provided for in Article V herein.

*Id.* at 151. After leaving, the partners were tendered payments of their capital share of the firm, but refused compensation for accounts receivable or acknowledgment that they maintained any interest in work in progress or unfinished business. *Id.* at 152. The California Supreme Court considered the validity and enforceability of the firm's partnership agreement on appeal.

■ ¶ 9 The California Supreme Court began its analysis with the California Business and Professional Code § 16602, which provided that a "partnership agreement may provide against competition by withdrawing partners in a limited geographical area." *Id.* at 154. The Court, faced with ethical concerns, considered whether this section could apply to lawyers. *Id.* at 155. The Court reasoned it could. We agree with that finding and adopt the following from the California Supreme Court:

The traditional view of the law firm as a stable institution with an assured future is now challenged by an awareness that even the largest and most prestigious firms are fragile economic units .... Not the least of the changes rocking the legal profession is the propensity of withdrawing partners in law firms to "grab" clients of the firm and set up a competing practice. In response, many firms have inserted noncompetition clauses into their partnership agreements. These noncompetition clauses have grown and flourished, despite, or in defiance of, the consistent holding of many courts across the nation that a noncompetition clause violates the rules of professional conduct of the legal profession. It is evident that these agreements address important business interests of law firms that can no longer be ignored.

The firm has a financial interest in the continued patronage of its clientele. The firm's capital finances the development of a clientele and the support services and training necessary to satisfactorily represent the clientele. In earlier times, this investment was fairly secure, because the continued loyalty of partners and associates to the firm was assumed. But more recently, lateral hiring of associates and partners, and the secession of partners from their firms has undermined this assumption. Withdrawing partners are able to announce their departure to clients of the firm, and many clients defect along with the attorneys with whom they have developed good working relationships. The practical fact is that when partners with a lucrative practice leave a law firm along with their clients, their departure from and competition with the firm can place a tremendous financial strain on the firm.

As Chief Justice Rehnquist has observed: "Institutional loyalty appears to be in decline. Partners in law firms have become increasingly 'mobile,' feeling much freer than they formerly did and having much greater opportunity than they formerly did, to shift from one firm to another and take revenue-producing clients with them." Not only is the income from the clientele of the firm

diminished when partners withdraw and take clients with them, but the expenses attributable to the remaining partners may increase as withdrawing partners seek to escape liability for mutually incurred debt. Recognizing these sweeping changes in the practice of law, we can see no legal justification for treating partners in law firms differently in this respect from partners in other businesses and professions.

*Id.* at 157 (internal citations omitted). We believe a forfeiture for competition clause serves as a sufficient tool to allow attorneys to leave a practice with one firm to start another. Notwithstanding, the clause affords protection to the original firm, and does not directly hinder the practice of law. "Financial-disincentive provisions differ from direct restrictive covenants. They do not impose a blanket or geographical ban on the practice of law nor do they directly prohibit an attorney from representing former clients." *Jacob v. Norris, McLaughlin & Marcus,* 128 N.J. 10, 22, 607 A.2d 142 (1992).

¶ 10 Other jurisdictions that have considered restrictive covenants for lawyers include *Peroff v. Liddy, Sullivan, Galway, Begler & Peroff, P.C.,* 852 F.Supp. 239 (S.D.N.Y.1994); *Cohen v. Lord, Day & Lord,* 75 N.Y.2d 95, 551 N.Y.S.2d 157, 550 N.E.2d 410 (1989); *Anderson v. Aspelmeier, Fisch, Power, Warner & Engberg,* 461 N.W.2d 598 (Iowa 1990); *Pettingell v. Morrison, Mahoney & Miller,* 426 Mass. 253, 687 N.E.2d 1237 (1997); and *Jacob v. Norris, McLaughlin & Marcus,* 128 N.J. 10, 607 A.2d 142 (N.J.1992).

■ ¶ 11 All of these jurisdictions substantiate their conclusions with ethical considerations, specifically Rule of Professional Conduct 5.6. In Pennsylvania, our Supreme Court via *Maritrans* instructs us that the Rules of Professional Conduct cannot substantiate a cause of action, in damages or for injunctive relief. *Maritrans,* 602 A.2d at 1284. While the rules can be considered, we cannot rely on them to decipher a question of law.

■ ¶ 12 We hold that a forfeiture for competition clause is enforceable in Pennsylvania for lawyers.[2] The clause, must still, however, meet the applicable standard for restrictive covenants. Our courts have held that a restrictive covenant (1) must be ancillary to the main purpose of a lawful transaction, (2) reasonably necessary,[3] (3) supported by consideration, and (4) application must be limited as to duration of time and territory. *Volunteer Firemen's Ins. Servs., Inc. v. CIGNA Ins. Agency,* 693 A.2d 1330, 1337 (Pa.Super.1997) (citing *Piercing Pagoda, Inc. v. Hoffner,* 465 Pa. 500, 507, 351 A.2d 207, 210 (1976)).

¶ 13 In conducting our analysis, we first note that the jury, as ultimate finder of fact, found that the shareholders of Latsha & Capozzi, P.C. had an oral agreement with appellee; i.e., if he left the law firm and competed with the firm, his stock would be valued at his capital contribution. N.T. Trial, 11/1/00, at 311–312. There is nothing in the record to indicate that the agreement was not part of an arms-length bargain between knowing and willing par-

---

**2.** This opinion is not to be read as considering a direct restriction on the practice of law.

**3.** The trial court, in its opinion, omitted prong two of the standard we assume because the *Piercing Pagoda* court essentially combined the first two elements. *Volunteer Firemen's Ins. Servs.,* 693 A.2d at 1337 n. 8. The devel-

opment of case law in this area has brought out prong two in the analysis. We will include it for absolute clarity. Nevertheless, we believe the trial court conducted the appropriate analysis, *sub judice,* and found the valuation agreement unenforceable as overbroad in both time and scope.

ties. *Boyce v. Smith–Edwards–Dunlap Co.*, 398 Pa.Super. 345, 580 A.2d 1382, 1387 (1990).

■ ¶ 14 The trial court believed that the first two prongs of the standard had been met by appellant's forfeiture clause. We disagree. It is our conclusion that the appellants' forfeiture clause is not reasonably necessary. The clause provided that if a partner left the firm, his stock would be valued at five thousand ($5,000) dollars, the amount of his initial capital contribution. In 1996, alone, Latsha & Capozzi, P.C. had grown to fifteen attorneys and had gross revenues of 2.6 million dollars. Trial Court Opinion and Order, 2/27/01, at 4. The forfeiture clause is unreasonable in light of the growth and revenue of the firm. In the aforementioned *Howard v. Babcock*, the departing partners received their proportional value of capital in the firm at the date they departed and were denied only a share of the accounts receivable and value of work in progress. *Howard*, 25 Cal.Rptr.2d 80, 863 P.2d at 152. We cannot find that a forfeiture clause entitling a co-founding, named partner to only five thousand ($5,000) dollars of a firm worth $2.6 million is reasonably necessary to protect the firm.

■ ¶ 15 We also agree with the trial court's finding that the clause was not limited in either time or territory and, as such, was unenforceable. Trial Court Opinion and Order, 2/27/01, at 18. As noted in *Bilec v. Auburn & Assocs., Inc.,* a non-competition agreement which bars competition in general business "without limitation as to time or area, [is] void on its face as being an unreasonable restraint of trade." 403 Pa.Super. 176, 588 A.2d 538, 542 (1991) (citation omitted). We, therefore, affirm the trial court's finding that Latsha and Capozzi's forfeiture for competition clause is an unreasonable restraint on competition. Appellee is entitled to a trial to determine the value of his stock in Latsha & Capozzi, P.C., as of the date of his departure.

■ ¶ 16 Appellants raise equitable estoppel in their third issue. Appellants contend that the court is barred from remedying the forfeiture clause because appellee contributed to its creation. Brief for Appellant at 18; *See Slater v. Slater,* 365 Pa. 321, 74 A.2d 179, 181 (1950). In *Slater,* our Supreme Court cited *Paul v. Paul,* for the proposition that if a plaintiff "cannot prove his case without showing he has broken the law or participated in a fraudulent transaction, the court will not assist him." *Id.* (quoting *Paul v. Paul,* 266 Pa. 241, 245, 109 A. 674 (1920)).

¶ 17 Although we find that appellee did help to create and implement the original oral forfeiture clause, we refuse to fashion law that would deny a party the opportunity to challenge an agreement restraining the ability to earn a livelihood. Furthermore, contrary to the quoted language in *Slater,* Pennsylvania courts have yet to hold any restrictive covenant illegal. At best, our Rules of Professional Conduct caution against their use. To couch such a covenant as illegal or fraudulent imposing equitable estoppel would be presumptuous.

¶ 18 We also dispose of appellant's fourth issue, which he prefaces with; "if it is determined there was no valid oral agreement." This issue is meritless because we have found that an oral agreement existed. Further, we have concluded, appellee was bound by the agreement. *See* Brief for Appellant at 4.

■ ¶ 19 Lastly, appellants contend that the trial court erred in excluding the testimony of Robert Davis, Esquire. "A trial court may properly exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues or misleading the jury."

*Mansour v. Linganna,* 787 A.2d 443, 448 (Pa.Super.2001). Absent a clear abuse of discretion, we will not disturb a trial court's evidentiary ruling. *See id.* We cannot find that the trial court abused its discretion here. Testimony of appellee's abuse of alcohol could have only served to improperly influence the jury.

¶ 20 Order affirmed.