SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| WILLIAM D. FEARNOW and ELIZABETH FEARNOW, | ) Arizona Supreme Court<br>) No. CV-05-0217-PR<br>) |
| Plaintiffs-Appellees, | ) Court of Appeals<br>) Division One |
| v. | ) No. 1 CA-CV 03-0650<br>) |
| RIDENOUR, SWENSON, CLEERE & EVANS, P.C., | ) Maricopa County<br>) Superior Court<br>) No. CV98-019171 |
| Defendants-Appellants. | )<br>)<br>) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable Anna M. Baca, Judge
The Honorable Colin F. Campbell, Judge

**VACATED AND REMANDED**

Opinion of the Court of Appeals, Division One
210 Ariz. 256, 110 P.3d 357 (2005)

**VACATED**
_____

PAUL G. ULRICH P.C.                                          Phoenix
     By    Paul G. Ulrich
           Pamela B. Petersen
Attorneys for William D. and Elizabeth Fearnow

OSBORN MALEDON P.A.                                          Phoenix
     By    Mark I. Harrison
           Thomas L. Hudson
           Diane M. Meyers
Attorneys for Ridenour, Swenson, Cleere & Evans, P.C.
_____

**H U R W I T Z**, Justice

¶1        Ethical Rule ("ER") 5.6(a) of the Arizona Rules of
Professional Conduct prohibits an "agreement that restricts the

right of a lawyer to practice [law] after termination of [a law firm] relationship." Ariz. R. Sup. Ct. 42 (2006). This case involves the application of ER 5.6(a) to a shareholder agreement requiring a departing lawyer to tender his stock to a professional corporation for no compensation if he thereafter competes with the corporation in the practice of law. We hold that such an agreement does not violate ER 5.6(a), but rather should be evaluated under the well-established law governing similar restrictive covenants in agreements between non-lawyers.

## I.

¶2        In 1987, William Fearnow paid $33,674.42 for a law firm partnership interest. Four years later, the partners decided to wind down the firm. Several partners, including Fearnow, formed a new firm, Ridenour, Swenson, Cleere & Evans, P.C. ("RSCE"). *See* Ariz. Rev. Stat. ("A.R.S.") §§ 10-2201 to -2249 (2004) (governing professional corporations) (hereinafter "the Professional Corporations Act" or "the Act"). The former partners made no new capital contributions to RSCE; rather, their original partnership contributions were converted to stock. Fearnow was thus deemed to have paid $33,674.42 for one share of RSCE stock.

¶3        Fearnow and the other RSCE shareholders signed a Shareholder Agreement ("Agreement"). The Agreement generally provided for the repurchase of a lawyer's stock for the original

subscription price upon disability, retirement, withdrawal, or expulsion from the firm. Separate provisions in the Agreement (collectively, the "voluntary withdrawal provisions") required a shareholder voluntarily withdrawing and thereafter competing in the firm's "geographic area for more than ten hours per week" to "tender his or her Share back to the Corporation for no compensation."[1]

¶4      In 1998, Fearnow voluntarily left RSCE to join another Phoenix firm. Fearnow demanded $33,674.42 for his RSCE stock. RSCE refused, citing the voluntary withdrawal provisions. Fearnow sued, alleging that the provisions violated ER 5.6(a).

¶5      The parties filed cross-motions for summary judgment. The superior court held that the voluntary withdrawal provisions violated ER 5.6(a) and were therefore unenforceable. Because the Agreement had no severability clause, the court held the entire contract invalid. The trial court then found Fearnow to be a "disqualified person" as defined by the Professional Corporations Act, *see* A.R.S. § 10-2201(1), and ordered a

---

[1]    The Agreement provides that "[o]ther than retirement, a Stockholder who withdraws from the Corporation shall tender his or her Share to the Corporation for no compensation." In turn, the Agreement defines retirement from the "private practice of law" as not "engaging in any lawyering activity in competition with the Corporation and within the Corporation's geographic area for more than ten hours per week." Collectively, these provisions bar repurchase if the shareholder voluntarily withdraws from the firm and then engages in the defined competition.

3

valuation of his stock pursuant to A.R.S. § 10-2223. The superior court ordered RSCE to repurchase the stock for $86,500.

¶6        The court of appeals affirmed in part and reversed in part. *Fearnow v. Ridenour, Swenson, Cleere & Evans, P.C.*, 210 Ariz. 256, 110 P.3d 357 (App. 2005). The court found the voluntary withdrawal provisions unenforceable, but held that Fearnow was not a "disqualified person" entitled to redemption of his stock under the Act. *Id*. at 262 ¶ 32, 110 P.3d at 363.

¶7        Fearnow petitioned for review and RSCE filed a conditional cross-petition. We granted review of both petitions because the issues presented are of first impression and statewide importance. We have jurisdiction pursuant to Article 6, Section 5(3), of the Arizona Constitution and A.R.S. § 12-120.24 (2003).

## II.

### A.

¶8        As a general rule, a contract restricting the right of an employee to compete with an employer after termination of employment "which is not unreasonable in its limitations should be upheld in the absence of a showing of bad faith or of contravening public policy." *Lassen v. Benton*, 86 Ariz. 323, 328, 346 P.2d 137, 140 (1959), *modified on other grounds*, 87 Ariz. 72, 347 P.2d 1012 (1959); *see also* 15 *Corbin on Contracts* § 80.15 (2003) (noting that in determining the enforceability of

4

such a provision, "reasonableness is the North Star").  Such a restrictive covenant is unreasonable if "(a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public." Restatement (Second) of Contracts § 188 (1981).

¶9        The determination of "[r]easonableness is a fact-intensive inquiry that depends on the totality of the circumstances."  *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 369 ¶ 20, 982 P.2d 1277, 1283 (1999).  "Each case hinges on its own particular facts."  *Bryceland v. Northey*, 160 Ariz. 213, 217, 772 P.2d 36, 40 (App. 1989).  As the court of appeals has noted,

> [w]hat is reasonable depends on the whole subject matter of the contract, the kind and character of the business, its location, the purpose to be accomplished by the restriction, and all the circumstances which show the intention of the parties.

*Gann v. Morris*, 122 Ariz. 517, 518, 596 P.2d 43, 44 (App. 1979).

¶10       Most of our cases concerning the enforcement of restrictive covenants deal with "non-compete" agreements, under which an employee is prohibited from competing with the former employer in a geographic area for a period of time.  *See, e.g.*, *Farber*, 194 Ariz. at 365 ¶ 3, 982 P.2d at 1279 (finding unreasonable a covenant between physicians forbidding competition within a five-mile radius of any medical office

5

owned by the former employer for three years); *Lassen*, 86 Ariz. at 328, 346 P.2d at 140 (finding reasonable a provision prohibiting competition for five years within a twelve-mile radius of a veterinarian's former employer). We have, however, employed the same fact-based reasonableness analysis to determine the enforceability of agreements under which a departing employee is not entirely forbidden to compete. *See Olliver/Pilcher Ins., Inc. v. Daniels*, 148 Ariz. 530, 715 P.2d 1218 (1986). *Olliver/Pilcher* involved an "anti-piracy" agreement forbidding solicitation of the former employer's customers. *Id.* at 531, 715 P.2d at 1219. While recognizing that such a provision is "less restrictive than a covenant not to compete," *id*. at 531, 715 P.2d at 1218, we reiterated that "'the test of validity of restrictive covenants is one of reasonableness,'" *id.* at 532, 715 P.2d at 1219 (quoting *Lessner Dental Labs. v. Kidney*, 16 Ariz. App. 159, 160, 492 P.2d 39, 40 (1971)).[2]

---

[2] Other courts have adopted a similar approach to agreements imposing restrictions less onerous than covenants not to compete. *See, e.g.*, *Tatom v. Ameritech Corp.*, 305 F.3d 737, 745 (7th Cir. 2002) (holding that a forfeiture provision will be enforced as long as it is reasonable); *Pollard v. Autotote, Ltd.*, 852 F.2d 67, 72 (3d Cir. 1989) (applying a reasonableness test to determine if a forfeiture-for-competition provision in a management incentive compensation plan is enforceable); *Harris v. Bolin*, 247 N.W.2d 600, 603 (Minn. 1976) (holding a forfeiture clause unenforceable as unreasonable); *Brockley v. Lozier Corp.*, 488 N.W.2d 556, 563 (Neb. 1992) (holding that penalties in profit sharing plans can be enforced only when reasonable).

6

¶11     Were Fearnow not an attorney, the voluntary withdrawal provisions would be subject to a fact-based reasonableness analysis.  This Court, however, has adopted a rule governing the ability of lawyers to enter into certain types of agreements.  That rule, ER 5.6, provides:

> A lawyer shall not participate in offering or making:
>
> (a) a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or
>
> (b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties.

Such restrictions are prohibited because they limit a lawyer's "professional autonomy" and interfere with "the freedom of clients to choose a lawyer."  ER 5.6 cmt.

¶12     The Arizona Rules of Professional Conduct, of which ER 5.6 is part, are based on the 1983 Model Rules of Professional Conduct promulgated by the American Bar Association ("ABA").  *See* Ariz. R. Sup. Ct. 42 (providing that the professional conduct of State Bar members shall be governed by the ABA Model Rules, as amended by this Court).  But even before the ABA adopted Model Rule 5.6(a), its Committee on Professional Ethics had issued several opinions condemning non-compete agreements among lawyers under previous Canons of Professional Ethics.

Those opinions stressed the same themes as the current commentary to ER 5.6 – lawyer autonomy and client choice. *See, e.g.*, ABA Comm. on Prof'l Ethics, Formal Op. 300 (1961) (finding a non-compete agreement improper under Canon 7 (forbidding encroachment on the business of another lawyer), Canon 27 (prohibiting solicitation), and Canon 35 (protecting client confidences)); ABA Comm. on Prof'l Ethics, Informal Op. 1072 (1968) (stating that covenants not to compete "interfere with and obstruct the freedom of the client in choosing and dealing with his lawyer" and that an "attorney must remain free to practice when and where he will and to be available to prospective clients who might desire to engage his services"). These opinions led to the adoption in 1969 of Disciplinary Rule ("DR") 2-108 of the Model Code of Professional Responsibility,[3] which in turn was incorporated into Rule 5.6 of the 1983 Model Rules without substantive change.

¶13     ER 5.6 categorically forbids lawyers from making an "agreement that restricts the right of a lawyer to practice after the termination of [a law firm] relationship," ER 5.6(a), or a settlement agreement containing "a restriction on a lawyer's right to practice," ER 5.6(b).   Neither ER 5.6 nor

---

[3]     Informal Opinion 1171 (1971) held that an agreement prohibiting a departing attorney from working with law firm clients violated DR 2-108.  Informal Opinion 1417 (1978) held that an agreement prohibiting a departing partner from hiring away firm associates violated DR 2-108.

prior ABA opinions, however, expressly deals with agreements that do not restrict a lawyer's right to practice or compete, but rather impose only some financial disincentive for doing so. Such provisions are before us today.

## C.

**¶14** In analyzing the voluntary withdrawal provisions, we write on a clean slate. No prior opinion of this Court has applied ER 5.6(a). We did, however, discuss ER 5.6 in *Farber*, which involved a covenant not to compete among physicians. In that case, we analogized the importance of a patient's right to choose a doctor to the need for a client to be free to choose an attorney. 194 Ariz. at 368 ¶¶ 16-17, 982 P.2d at 1282. Citing ER 5.6, we stated that "restrictive covenants are prohibited between attorneys," *id.* at 369 ¶ 18, 982 P.2d at 1283, and that "public policy considerations preclude their applicability," *id.* (*quoting Dwyer v. Jung*, 336 A.2d 498, 500 (N.J. Super. Ct. Ch. Div. 1975) (quotation marks omitted)). We concluded that the doctor/patient relationship, like the attorney/client relationship, "is special and entitled to unique protection." *Id.* ¶ 19. We did not, however, find the covenant in *Farber* invalid as a matter of law. Expressly declining the invitation to hold such agreements between physicians "void per se as against public policy," *id*. ¶ 19 n.1, we instead examined the covenant for reasonableness, *id.* ¶ 19.

¶15     The above-quoted dicta from *Farber* support the conclusion that agreements violative of ER 5.6(a) will not be enforced.  Cases from other jurisdictions so hold, finding void agreements that expressly forbid attorneys from representing particular clients or competing in a specific geographic area for a specified period of time.  *See, e.g.*, *White v. Med. Review Consultants, Inc.*, 831 S.W.2d 662, 664-65 (Mo. Ct. App. 1992) (upholding a rule prohibiting the restriction of a lawyer's right to practice); *Dwyer*, 336 A.2d at 501 (finding void as against public policy a covenant prohibiting departing attorneys from working with partnership clients).

¶16     The case law is less clear, however, when the covenant does not categorically forbid competition or representation of former clients, but rather provides only a financial disincentive that may discourage the departing lawyer from doing so.  Many courts hold such provisions void.  For example, in an oft-quoted opinion, the New York Court of Appeals refused to enforce a law firm partnership agreement that conditioned the payment of earned but uncollected partnership revenues upon a withdrawing partner's refraining from competing with the firm. *Cohen v. Lord, Day & Lord*, 550 N.E.2d 410, 410 (N.Y. 1989).  The court reasoned:

> [W]hile the provision in question does not expressly
> or completely prohibit a withdrawing partner from
> engaging in the practice of law, the significant

10

monetary penalty it exacts, if the withdrawing partner practices competitively with the former firm, constitutes an impermissible restriction on the practice of law. The forfeiture-for-compensation provision would functionally and realistically discourage and foreclose a withdrawing partner from serving clients who might wish to continue to be represented by the withdrawing lawyer and would thus interfere with the client's choice of counsel.

*Id.* at 411. Other jurisdictions have reached similar results on similar reasoning.[4]

**¶17**　　There is, however, a strong opposing view, articulated principally by the California courts. The seminal case is *Haight, Brown & Bonesteel v. Superior Court*, 285 Cal. Rptr. 845 (Ct. App. 1991), which involved a provision requiring withdrawing attorneys competing with the law firm to forfeit capital investments and accounts receivable. Construing an ethical rule quite similar to ER 5.6,[5] the court found that the

---

[4]　　*See, e.g.*, *Jacob v. Norris, McLaughlin & Marcus*, 607 A.2d 142, 148 (N.J. 1992) (refusing to enforce a provision withholding termination benefits for departing attorney who competes with firm); *Katchen v. Wolff & Samson*, 610 A.2d 415, 419 (N.J. Super. Ct. App. Div. 1992) (finding that the challenged provision "has the effect of discouraging competition and forces an attorney to decide whether he should stay with a firm that admittedly fairly compensates him or leave the firm at a financial risk to himself in order to better serve his clients"); *Gray v. Martin*, 663 P.2d 1285, 1290 (Or. Ct. App. 1983) (refusing to enforce a contract preventing a withdrawing attorney from receiving termination benefits if the attorney continues to practice in certain counties).

[5]　　The rule at issue, Rule 1-500 of the Rules of Professional Conduct of the State Bar of California, provided as follows:

11

provision was not prohibited because it did "not expressly or completely prohibit the [attorneys] from engaging in the practice of law, or from representing clients." *Id.* at 848. The court noted that the rule "simply provides that an attorney may not enter into an agreement to refrain from the practice of law." *Id.* The rule does not

> prohibit a withdrawing partner from agreeing to compensate his former partners in the event he chooses to represent clients previously represented by the firm from which he has withdrawn. Such a construction represents a balance between competing interests. On the one hand, it enables departing attorneys to withdraw from a partnership and continue to practice anywhere within the state, and to be able to accept employment should he choose to so do from any client who desires to retain him. On the other hand, the remaining partners remain able to preserve the

---

(A) A member shall not be a party to or participate in offering or making an agreement, whether in connection with the settlement of a lawsuit or otherwise, if the agreement restricts the right of a member to practice law, except that this rule shall not prohibit such an agreement which:

(1) Is a part of an employment, shareholders', or partnership agreement among members provided the restrictive agreement does not survive the termination of the employment, shareholder, or partnership relationship; or

(2) Requires payments to a member upon the member's retirement from the practice of law; or

(3) Is authorized by Business and Professions Code sections 6092.5, subdivision (i) or 6093.

(B) A member shall not be a party to or participate in offering or making an agreement which precludes the reporting of a violation of these rules.

> stability of the law firm by making available the withdrawing partner's share of capital and accounts receivable to replace the loss of the stream of income from the clients taken by the withdrawing partner to support the partnership's debts.

*Id.* at 848.

¶18     Three years later, the California Supreme Court held that "an agreement among law partners imposing a reasonable toll on departing partners who compete with the firm is enforceable." *Howard v. Babcock*, 863 P.2d 150, 151 (Cal. 1994). The provision at issue required departing attorneys who worked with other departing attorneys in competition with the law firm to forfeit all withdrawal benefits; departing attorneys who worked on their own but competed with the law firm were required to forfeit seventy-five percent of their benefits. *Id.* *Howard* was decided against a backdrop of California statutes favoring non-compete agreements. *Id.* at 154. But the decision did not turn on those statutes; the court expressly noted that it had the "power to impose a higher standard of conduct on lawyers" through ethical rules. *Id.* at 155. The California Supreme Court concluded, however, that its ethical rule was not "intended to . . . prohibit the type of agreement that is at issue here." *Id.* at 155-56. *Howard* found a critical distinction between an agreement imposing disincentives against competition and one forbidding competition:

> An agreement that assesses a reasonable cost against a partner who chooses to compete with his or her former partners does not restrict the practice of law. Rather, it attaches an economic consequence to a departing partner's unrestricted choice to pursue a particular kind of practice.

*Id.* at 156.

¶19 Recognizing that law firms have an obligation to protect their own economic interests and their investments in training and promoting partners, *Howard* found "no legal justification for treating partners in law firms differently in this respect from partners in other business and professions." *Id.* at 157. Such an approach, the court noted, would "have no deleterious effect on the current ability of clients to retain loyal, competent counsel of their choice." *Id.* at 156-57. Thus, *Howard* concluded that a contract provision that did not prevent a departing lawyer from competing was not void on its face, but rather would be evaluated for reasonableness. *Id.* at 160.[6]

---

[6] *See also Pettingell v. Morrison, Mahoney & Miller*, 687 N.E.2d 1237, 1240 (Mass. 1997) (stating that a financial penalty may be valid if it is a "reasonable recognition of a law firm's financial loss due to the departure of a partner"); *McCrosky, Feldman, Cochrane & Brock, P.C. v. Waters*, 494 N.W.2d 826, 828-29 (Mich. Ct. App. 1992) (finding financial disincentive provisions valid because they were "not so overreaching that they amount to an actual restriction on the defendant's right to practice law"); *Capozzi v. Latsha & Capozzi, P.C.*, 797 A.2d 314, 320 (Pa. Super. Ct. 2002) (finding that a forfeiture clause must meet the reasonableness standard used to evaluate non-compete clauses involving other professionals).

¶**20**    We find the reasoning of *Howard* compelling.   ER 5.6 prohibits only an agreement "that *restricts the right of a lawyer to practice*" law after termination of employment with a firm.  (Emphasis added.)  It is one thing for this Court, in its supervisory capacity over the legal profession, to adopt a limited exception to the general rule construing restrictive covenants for reasonableness when confronting a contract the terms of which forbid a lawyer from engaging in practice or representing certain clients.   It is quite another, as *Howard* notes, to completely "distinguish lawyers from other professionals such as doctors or accountants, who also owe a high degree of skill and loyalty to their patients and clients." *Howard*, 863 P.2d at 160.[7]  We are unable to conclude that the interests of a lawyer's clients are so superior to those of a

---

[7]    *See* Anderson & Steele, *Ethics and the Law of Contract Juxtaposed:  A Jaundiced View of Professional Responsibility Considerations in the Attorney-Client Relationship*, 4 Geo. J. Legal Ethics 791, 846 (1991):

> Whether the fulcrum for balancing interests of clients over those of their lawyers is a narcissistic concept of ourselves as paragons of professional propriety – as super-fiduciaries – or the absurdly conflicting notion that good lawyers are hard to find, we wonder how much longer these outmoded, unrealistic concepts can be used to deny attorneys fair access to the norms of the marketplace, restricted only by the same rules applicable to doctors, to ministers, to accountants, and to all other fiduciary-based professions.

doctor's patients (whose choice of a physician may literally be a life-or-death decision) as to require a unique rule applicable only to attorneys.  The language of ER 5.6 does not support such a sweeping special treatment of lawyers, nor does protection of clients mandate such a result.[8]

**¶21**     We therefore decline to read ER 5.6(a) in the expansive fashion suggested by Fearnow.  Although the rule prohibits – and we will hold unenforceable – agreements that forbid a lawyer to represent certain clients or engage in practice in certain areas or at certain times, its language should not be stretched to condemn categorically all agreements imposing any disincentive upon lawyers from leaving law firm employment.  Such agreements, as is the case with restrictive covenants between other professionals, should be examined under the reasonableness standard.[9]

---

[8]     It is difficult to see how *client* choice is significantly impacted by our reading of ER 5.6(a).  The client is of course free to remain with the lawyer, whether or not the lawyer chooses to stay at his original firm or go elsewhere.

[9]     Neither the comments to the ABA Model Rules nor the Restatement compel a contrary conclusion.  The comments to the ABA Model Rule 5.6 are simply silent on the topic today before us.  Restatement (Third) of the Law Governing Lawyers § 13(1) (2000) simply states, in language virtually identical to the text of ER 5.6(a), that a lawyer may not "enter into a law-firm agreement that restricts the right of the lawyer to practice law after terminating the relationship."  The commentary to § 13 recognizes that a majority of courts have construed this language as encompassing agreements imposing financial penalties on departing lawyers who decide to compete, *id.* cmt. a., but

16

**E.**

¶22     The Shareholder Agreement requires a withdrawing attorney engaging in "lawyering activity in competition with the Corporation and within the Corporation's geographic area" to forfeit his or her stock in the professional corporation. The provisions do not restrict the lawyer's right to practice law after termination. Rather, they merely provide a lawyer who withdraws and decides to practice elsewhere with less money than others making different decisions.

¶23     Because the superior court held that the voluntary withdrawal provisions were void as a matter of law, it did not construe the provisions for reasonableness. The court of appeals, even assuming that the case was governed by the more permissive standard of *Howard*, found the provisions unreasonable as a matter of law because they required Fearnow to forfeit his entire capital contribution even if he took no RSCE clients. *Fearnow*, 210 Ariz. at 259 ¶ 17, 110 P.3d at 360.

¶24     As an initial matter, we note that RSCE claims that Fearnow did take clients with him upon his departure; the court of appeals' observation that the voluntary withdrawal provisions might be unreasonable when applied to a lawyer who took none is

---

also acknowledges that other courts and commentators have reached a different interpretation of the rule. *See id.*, Reporter's Note.

thus not dispositive.[10]  More importantly, because the case was decided on summary judgment under the superior court's view of ER 5.6(a), RSCE never had the opportunity below to present facts concerning the reasonableness of the provisions.  Nor has Fearnow had the opportunity to present evidence that these particular provisions are unreasonable.  Because "[e]ach case turns on its own particular facts," *Bryceland*, 160 Ariz. at 217, 772 P.2d at 40, we cannot conclude as a matter of law whether the voluntary withdrawal provisions are reasonable.  We remand to allow the superior court to address the reasonableness of the voluntary withdrawal provisions.[11]

### III.

¶25     The second issue before us is the appropriate remedy if the voluntary withdrawal provisions are found unreasonable.

---

[10]   Even if a departing lawyer takes no clients, some level of financial penalty for withdrawal could conceivably be reasonable if, for example, the firm undertook capital expenditures or hired associate attorneys based on the presence of the former partner, or if the departure imposed costs in changing the firm name and related marketing materials.

[11]   In determining the reasonableness of the voluntary withdrawal provisions, the superior court may consider that no financial penalty is imposed on withdrawing members who do not compete in the stated geographic area.  But even if such discrimination might tend to show the unreasonableness of the voluntary withdrawal provisions, we are unable today, on the record before us, to conclude that this fact alone renders the provision automatically unreasonable as a matter of law. Rather, the question is whether there is a reasonable basis for such discrimination, an issue that turns on the particular facts of each case.

18

The superior court held that Fearnow was entitled to redemption of his stock under the Professional Corporations Act as a "disqualified person."  The court of appeals disagreed, holding that Fearnow has no such statutory remedy as long as he is licensed to practice law.  *Fearnow*, 210 Ariz. at 260 ¶ 23, 110 P.3d at 361.

¶26    We agree with the court of appeals.  Section 10-2201(1) defines a "disqualified" person as "an individual or entity that is not or ceases to be a qualified person"; section 10-2201(7) in turn defines a "qualified person" simply as "a person that is eligible under this chapter to be issued shares by a professional corporation."  As the court of appeals correctly noted, section 10-2220(A)(1) allows issuance of shares to "[i]ndividuals who are licensed by law in this or another state to render a professional service described in the corporation's articles of incorporation."  At all times relevant to this case, Fearnow was licensed to practice law in Arizona. He therefore is not a "disqualified person."[12]

¶27    *Vinall v. Hoffman*, 133 Ariz. 322, 651 P.2d 850 (1982), upon which Fearnow relies, is not to the contrary.  That case

_____

[12]    Had Fearnow been a disqualified person, the proper procedure under the Professional Corporations Act would be to first allow the corporation an opportunity to present a fair value offer for repurchase of the share.  A.R.S. § 10-2224.  A valuation proceeding is required only if the corporation refuses to make an offer or after the disqualified person rejects the offer.  A.R.S. § 10-2225(A).

19

involved a prior version of the Professional Corporations Act, which required the repurchase of stock after the "resignation" of a shareholder. *Id*. at 323, 651 P.2d at 851 (citing former A.R.S. § 10-909(D) (repealed 1995)). Our holding in *Vinall* that the word "resignation" meant resignation from the corporation, not the profession, is therefore of no aid in interpreting the present version of the Professional Corporations Act, which triggers the right to repurchase upon "disqualification."

¶28    But it does not follow, as the court of appeals held, that Fearnow must retain his RSCE stock until his retirement or disqualification to practice law. The Professional Corporations Act provides that "[a] provision for the acquisition of shares contained in a professional corporation's articles of incorporation or bylaws or in a private agreement is enforceable." A.R.S. § 10-2223(A). Therefore, should the voluntary withdrawal provisions be eventually found unreasonable, the next question is whether the Agreement nonetheless requires the acquisition of Fearnow's shares.

¶29    The superior court held that because the Agreement had no severability clause, Fearnow had no contractual remedy. The court of appeals, while disagreeing with the superior court's conclusion that Fearnow was entitled to repurchase of his stock under the Professional Corporations Act, did not address whether the Agreement itself provided a remedy. *Fearnow*, 210 Ariz. at

20

262 ¶ 29 n.8, 110 P.3d at 363 n.8 (stating that "we merely hold that there is not a remedy under the Act that provides for the mandatory repurchase of such shares as long as the departing shareholder remains licensed").

¶30    Although the Agreement has no severability clause, we believe that the contract nonetheless requires repurchase of Fearnow's share for his original subscription price if the voluntary withdrawal provisions are deemed unenforceable. Under the Agreement, any shareholder who becomes permanently disabled, retires from the practice of law, is expelled from the law firm, or voluntarily withdraws must tender his or her stock to the corporation. In all cases but one, that tender is made in return for the original subscription price. Only the partner who voluntarily withdraws and competes with the firm in a stated geographic area is forced to tender stock for no compensation.

¶31    Although "we will not permit courts to add terms or rewrite provisions" to covenants, *Farber*, 194 Ariz. at 372 ¶ 31, 982 P.2d at 1286, "Arizona courts will 'blue pencil' restrictive covenants, eliminating grammatically severable, unreasonable provisions," *id*. ¶ 30. In this case, the voluntary withdrawal provisions are severable from the balance of the agreement. The contracting parties plainly contemplated that *all* departing shareholders would be required to return their stock to RSCE. The Agreement also provides that all but those choosing to

21

compete would receive their original subscriptions in return for the stock. If the only exceptions to the rule – the voluntary withdrawal provisions – are unenforceable, the severability of those provisions is plainly "evident from the contract itself." *Olliver/Pilcher*, 148 Ariz. at 533, 715 P.2d at 1221.

¶32    Therefore, if the superior court concludes on remand that the voluntary withdrawal provisions are unreasonable, it should order RSCE to repurchase Fearnow's share for $33,674.42, his original subscription price.

**IV.**

¶33    For the reasons above, we vacate the opinion of the court of appeals, vacate the judgment of the superior court, and remand to the superior court for further proceedings consistent with this opinion. Because we do not yet know which party will ultimately be successful in this matter, we decline to award either party attorneys' fees either under the Agreement or under A.R.S. § 12-341.01.[13]

_____
Andrew D. Hurwitz, Justice

---

[13]    Fearnow has also requested fees under A.R.S. § 10-2226. That provision, however, applies only to an evaluation/repurchase proceeding required by the Professional Corporations Act, and cannot be invoked here in light of our conclusion that Fearnow is not a "disqualified" person under the Act.

CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


**B A L E S**, Justice, concurring in part and dissenting in part

¶**34**      The law firm in this case seeks to impose a penalty of $33,674 on an ex-partner merely because he competed with the firm for clients.  Exacting significant financial penalties from former lawyers who compete, I believe, "restricts the right of a lawyer to practice" in violation of ER 5.6(a).  My position, unlike that of the majority, is consistent with the language and purpose of our ethical rule.  It also comports with the views of most other courts that have addressed this issue, as well as the Restatement (Third) of the Law Governing Lawyers (2000) ("Restatement").  Thus, I respectfully dissent from the majority's holdings concerning the scope of ER 5.6(a) and the need to remand this case to determine the reasonableness of the "voluntary withdrawal" provisions.

¶**35**     By its terms, ER 5.6(a) prohibits more than just non-compete agreements among attorneys.  The rule more generally bars lawyers from entering agreements that "restrict" their right to practice after departing a firm.  We have long recognized that non-compete agreements are one form of the broader category of restrictive covenants.  *See, e.g., Olliver/Pilcher Ins., Inc. v. Daniels*, 148 Ariz. 530, 531-32, 715 P.2d 1218, 1219-20 (1986) (distinguishing non-compete agreement from restrictive covenant requiring insurance employee to pay former employer share of fees earned if customers followed employee).  While stating that the language of ER 5.6 should not be "stretched" beyond non-compete agreements, op. ¶ 21, the majority in fact compresses the rule to less than what its terms expressly provide.

¶**36**     Most courts and commentators recognize that law firm agreements that impose significant penalties on competing former lawyers do in fact "restrict" a lawyer's right to practice within the meaning of rules like ER 5.6(a).  *See, e.g., Pettingell v. Morrison, Mahoney & Miller*, 687 N.E.2d 1237, 1239 (Mass. 1997) (noting the "strong majority rule" that courts will not give effect to agreements that impose substantial financial penalties on lawyers for competing with former firms); *Cohen v. Lord, Day & Lord*, 550 N.E.2d 410, 411-12 (N.Y. 1989) (noting

24

that reading rule to apply only to provisions that expressly prohibit practice of law conflicts with language and purpose of rule); 2 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* 47-6 (3d ed. 2005) ("*The Law of Lawyering*") (noting it has become "generally accepted that financial disincentives 'restrict' the departing lawyer's right to practice [and] thus implicat[e] Rule 5.6(a)").

¶37        Similarly, the Restatement, like our ER 5.6(a), bars lawyers from entering agreements "that restrict [] the right of the lawyer to practice law after terminating the relationship." Restatement § 13(1).  Reflecting the generally accepted view, the official comments to the Restatement note that:

> [S]uch rules preclude enforcement of a provision of a firm agreement under which a departing lawyer is denied otherwise-accrued financial benefits on entering into competitive law practice, unless the denial applies to all departing lawyers, whether entering into private practice or not . . . .

*Id.* cmt. b.

¶38        The Restatement approach desirably promotes the policies that underlie ER 5.6.  These policies are two-fold: preserving both the freedom of clients to choose their lawyers and the professional autonomy of lawyers to choose where to practice and whom to represent.  *See* ER 5.6(a), cmt. 1; *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 369 ¶ 18, 982 P.2d 1277, 1283 (1999).  Discussing American Bar Association ("ABA")

25

Model Rule of Professional Conduct 5.6(a), from which our rule is drawn, Professors Hazard and Hodes observe:

> Rule 5.6(a) is designed in part to protect lawyers, particularly young lawyers, from bargaining away their right to open their own offices after they end an association with a firm or other legal employer. It also protects future clients against having a restricted pool of attorneys from which to choose.

*The Law of Lawyering* at 47-5.

¶39    Some law firms have tried to restrict competition under the guise of retirement provisions, because ER 5.6(a)'s prohibitions do not apply to agreements concerning retirement benefits. *See id.* Such efforts typically provide for the forfeiture of capital shares or fee income that would otherwise be due a departing lawyer. "Often, the anticompetitive nature of such clauses . . . is made all the more clear by the fact that they become inoperative if the lawyer relocates to a different geographic area." *Id.* These observations apply to the voluntary withdrawal provisions at issue here, as they result in the forfeiture of the stock purchase price only for those former lawyers who compete with the firm.

¶40    "Onerous financial terms of this kind effectively limit the mobility and availability of still active lawyers, and correspondingly reduce client choice." *Id.; accord Cohen*, 550 N.E.2d at 411 ("The forfeiture-for-competition provision would functionally and realistically discourage and foreclose a

26

withdrawing partner from serving clients who might wish to continue to be represented by the withdrawing lawyer and would thus interfere with the client's choice of counsel.").

¶41    In declining to follow the generally accepted approach as reflected in the Restatement, the majority observes that it writes "on a clean slate." Op. ¶ 14. This is true, however, only in the narrow sense that we have not previously decided a case that actually applied ER 5.6(a) to lawyers. We have, however, recognized that ER 5.6(a) prohibits restrictive covenants among attorneys. *See Valley Med. Specialists*, 194 Ariz. at 368 ¶ 17, 982 P.2d at 1282 (citing, inter alia, *Cohen,* 550 N.E.2d at 410-11). Moreover, in other contexts, we have often noted that, in the absence of contrary Arizona law, our courts generally follow the Restatement. *See, e.g.*, *Espinoza v. Schulenburg,* 212 Ariz. 215, 217 ¶ 9, 129 P.3d 937, 939 (2006). The majority unconvincingly departs from our usual approach by observing, op. ¶ 21 n.8, that the Reporter's Notes to Restatement § 13(1) acknowledge that some courts and commentators do not adopt the Restatement's interpretation — something that could be said of nearly every provision in any Restatement.

¶42    The slate is also not clean in that this court only recently approved extensive revisions to our rules of professional conduct, including amendments to ER 5.6(a). *See*

27

Order Amending Ariz. R. Sup. Ct. 42 and 43, E.R. 5.6 (2003). These rule changes were the end result of a process that began with the ABA's Ethics 2000 Commission, which thoroughly reviewed and updated the Model Rules of Professional Conduct. The Arizona State Bar's Board of Governors in turn established an Ethical Rules Review Group to review the new ABA Model Rules and to recommend appropriate changes to our rules. The only changes proposed for ER 5.6(a) were to broaden its scope to clarify that it applies to all forms of agreements — whether partnership, shareholder, operating, employment, or otherwise — restricting a lawyer's right to practice after leaving a firm.[14]

¶**43** No one suggested that ER 5.6(a) should be revised to limit the rule's prohibitions to only those agreements expressly barring a lawyer from competing in certain areas or for certain clients. Instead, in requesting changes to ER 5.6(a), the State Bar specifically noted that, "[a]s amended, the Rule and Comments are consistent with the corresponding ABA Model Rule and Comments." Petition R-02-0045 for Amendment of Arizona

---

[14] The changes to ER 5.6(a), which became effective on December 1, 2003, are indicated with underlined additions and struck-through deletions in the following text:

> A lawyer shall not participate in offering or making: (a) a partnership, shareholders, operating, ~~or~~ employment, or other similar type of agreement that restricts the ~~rights~~right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement.

28

Supreme Court Rules 42 and 43 at 21 (2002). One would think that, if Arizona had adopted or proposed to adopt a version of ER 5.6(a) that is narrower than the generally accepted interpretation of Model Rule 5.6 and Restatement § 13, there would be some attention to this fact.

¶44 The majority instead defends its constricted reading of Arizona's ER 5.6(a) by relying on the California Supreme Court's decision in *Howard v. Babcock*, 863 P.2d 150, 151 (Cal. 1993), which interpreted Rule 1-500 of the California State Bar's Rules of Professional Conduct. Op. ¶¶ 18-20. For several reasons, I find *Howard*'s reasoning unpersuasive. *Cf. Pettingell*, 687 N.E.2d at 1239 (noting that "[c]ourts have not been attracted to the [minority] view expressed in *Howard*"). California's Rule 1-500 is on its face narrower than ER 5.6(a) because it expressly allows restrictions on a lawyer's right to practice that satisfy California's Business and Professions Code, which itself allows certain restrictive covenants. Consistent with the California statutes, the premise of the *Howard* decision is that law firm partners should be treated, in terms of restrictive covenants, no "differently . . . [than] partners in other businesses and professions." 863 P.2d at 157.

¶45 *Howard*'s equation of law firm partners with other professionals does not work in Arizona. Our ER 5.6(a) is not limited to restrictions affecting law firm partners, but instead

29

applies broadly to agreements restricting the right of any lawyer to practice. *See* ER 5.6(a) & cmt. 1. Reading ER 5.6 narrowly, as does the majority, will impact all lawyers, and not merely law firm partners. Arizona, unlike California, also has no rule providing that lawyers may enter restrictive covenants otherwise authorized by our general professional statutes. Finally, we have already recognized that ER 5.6(a) is broader than the prohibitions on restrictive covenants for other professionals, such as doctors. *See Valley Med. Specialists*, 194 Ariz. at 368-69 ¶¶ 16-17, 982 P.2d at 1282-83 (noting that although the American Medical Association only discourages restrictive covenants between physicians, such covenants are actually prohibited among attorneys). Thus, the fact that professionals other than lawyers may also owe duties to their clients cannot determine the scope of ER 5.6(a), a rule that reflects this court's authority to regulate the practice of law and interests in client choice and lawyer autonomy that are in some respects unique to the legal profession.

¶46 At bottom, the majority's decision to limit ER 5.6(a) to only those agreements that expressly bar a lawyer from competing with a former firm rests on a policy concern — the view that law firms should be able to protect their own economic interests by imposing financial penalties on former lawyers who compete. *See* Op. ¶ 19; *cf. The Law of Lawyering* at 47-6

30

(recognizing that *Howard* rests on policy concerns that give primacy to law firm continuity). This policy, however, is not recognized by either the text of ER 5.6(a) or its previously identified purposes. *See Pettingell*, 687 N.E.2d at 1239 & n.4 (noting that Model Rule 5.6 focuses on lawyer autonomy and, chiefly, client choice, "not the interrelationship of the partners and former partners"). If a law firm's "obligation to protect [its] own economic interests," op. ¶ 19, merits recognition in ER 5.6(a), we should consider proposals to amend the rule, which would allow an opportunity for broad public comment and full consideration of the interests involved, rather than engrafting California's minority approach onto our rule by judicial decision.

¶47 The majority's approach will unfortunately subvert the interests that *are* protected by ER 5.6(a). Law firms and other legal employers will be encouraged to avoid the prohibitions in ER 5.6(a) by seeking to impose — as this case illustrates — financial penalties rather than explicit restrictions on competing former attorneys. Because the legality of such penalties will be judged only post hoc under a vague reasonableness standard, lawyers will be discouraged from leaving their firms to compete or from challenging post-departure restrictions. *Cf. Valley Med. Specialists*, 194 Ariz. at 372 ¶ 31, 982 P.2d at 1286 (recognizing that restrictive

31

covenants that are not challenged in court may have *in terrorem* effect on departing employees). This result may help law firms tighten the golden handcuffs on their lawyers; it will not promote autonomy on the part of individual attorneys or the freedom of clients to be represented by the lawyer of their choice.

¶48 I would instead apply ER 5.6(a) by its terms and hold that the voluntary withdrawal provisions at issue here — which require a former lawyer to forfeit the purchase price of his stock if he competes after departing — are a restriction on a lawyer's right to practice and are therefore unenforceable. The majority's holding that such provisions escape the prohibitions of ER 5.6(a) will undermine the interests protected by that rule and unnecessarily require courts to engage in fact-specific adjudication over penalty provisions that should be held void on their face.

## II.

¶49 Even if I accepted the majority's conclusion that the penalty provisions in this case should be evaluated for their "reasonableness," a remand would not be necessary. Although a fact-specific inquiry, the reasonableness of restrictive covenants remains a question of law in Arizona. *Valley Med. Specialists*, 194 Ariz. at 366-67 ¶ 11, 982 P.2d at 1280-81. Further, "a covenant not to compete is invalid unless it

32

protects some legitimate interest beyond the employer's desire to protect itself from competition." *Id.* at 367 ¶ 12, 982 P.2d at 1281 (citations omitted).

¶50 The law firm did have an opportunity below to present facts concerning the reasonableness of the "voluntary withdrawal" provisions. In briefing on the cross-motions for summary judgment, RSCE specifically argued that the provisions are reasonable under the *Howard* approach. In support of this argument, RSCE contended that the provisions do not result in any forfeiture on the part of Fearnow (an implausible assertion which the majority itself rejects) and that the provisions are reasonable because the firm lost clients who chose to follow Fearnow after he departed. The second reason offered by RSCE to support the provisions fails as a matter of law — given ER 5.6(a), the firm has no legitimate interest merely in avoiding competition for its clients by its former lawyers.

¶51 To the extent that other rationales might be offered for requiring departing lawyers to forfeit the price of their capital stock upon withdrawal, e.g., a firm's desire to recoup some transition costs or to reserve sufficient funds to cover firm debts, the provision here is patently under-inclusive, and thus unreasonable, because it singles out only those former lawyers who compete. *Cf. Pettingell*, 687 N.E.2d at 1240 (acknowledging that a firm might reasonably apply a charge to

33

all attorneys to prevent the firm from being left with "onerous" debts); *Denburg v. Parker Chapin Flattau & Klimpl*, 624 N.E.2d 995, 999 (N.Y. 1993) (rejecting argument that capital forfeiture provision was justified by desire to recoup firm's relocation costs where penalty applied only to those departing lawyers who were potential competitors).

¶52     RSCE already had an opportunity to present facts in support of the reasonableness of its provisions or to identify disputed material facts that preclude summary judgment. *Cf. Valley Med. Specialists,* 194 Ariz. at 372 ¶ 33, 982 P.2d at 1286 (noting party seeking to enforce restrictive covenant has burden of showing it "is no greater than necessary to protect the employer's legitimate interest, and that such interest is not outweighed by" harm to employee or public). It failed to do so, and there is no good reason to prolong this litigation by remanding for further proceedings on this issue.

### III.

¶53     I concur in the majority's opinion insofar as it holds that, if the "voluntary withdrawal" provisions are unenforceable, the appropriate remedy is for Fearnow to recover the amount he originally was deemed to have paid for his stock.

_____
                              W. Scott Bales, Justice