

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00112-CV

———————————————

DAVID A. SKEELS, Appellant

V.

JONATHAN T. SUDER, MICHAEL T. COOKE, AND FRIEDMAN, SUDER &
COOKE, P.C., Appellees

On Appeal from the 236th District Court
Tarrant County, Texas
Trial Court No. 236-284262-16

Dissenting Memorandum Opinion on Further Rehearing by Justice Birdwell

**DISSENTING MEMORANDUM OPINION ON FURTHER REHEARING**

I respectfully dissent to the majority's decision to affirm the trial court's declaratory judgment for the Firm and its denial of Skeels's competing declaratory-judgment claim (although I offer no opinion on the potential merits of Skeels's claims dependent on his remaining a Firm shareholder). I have no quarrel with the premise that the parties could have agreed to handle redemption contrary to the Texas Business Organizations Code (BOC). But they did not. To understand why, one must examine two things: (1) the BOC's structure and statutory scheme for redemption pertaining to both for-profit and professional corporations like the Firm and (2) the unambiguous meaning of the Firm's shareholders' agreement according to bedrock contract-construction principles.

I recognize that the outcome of my analysis has the effect of prolonging a dispute that should have been settled long before the charged attorneys' fees surpassed any potential for meaningful damage-recovery or the victory of a take-nothing judgment. Likewise, I cannot deny that, in hindsight, this is the type of dispute the Firm wished to avert in attempting to memorialize its previously unwritten decision-making structure. But I do not believe we can go back in time and stretch the law and the language of the Resolution to resolve this dispute over the Firm's corporate structure and governance that should have been expressly resolved in the Firm's own governing documents and shareholders' agreements. The majority's

decision reads too much into the Resolution and not enough into the precise words chosen by the Legislature in the BOC.

## I. Parties Were Free to Expressly Contract Around BOC Redemption Provisions

I begin by recognizing Texas's strong policy preference for freedom of contract, which is well-supported by the common law. *See Energy Transfer Partners, L.P. v. Enter. Partners, L.P.*, 593 S.W.3d 732, 738 (Tex. 2021) ("Our decisions recognizing this policy are decades older than the BOC or its predecessor statute."). Any analysis of the Resolution in relation to the BOC must be undertaken with this strong policy, which is codified in the BOC, in mind.[1] *See id.* at 738–40.

In considering the interplay between the Resolution and the BOC's directives regarding stock redemption, we must construe the Resolution according to well-established contract-construction principles, which may take into account the surrounding circumstances of the agreement's execution. As the Texas Supreme Court has recently explained,

> We have long articulated a principle of contract construction that permits courts to consult the facts and circumstances surrounding a negotiated contract's execution to aid the interpretation of its language. Despite expounding on this principle from time to time, and as recently as last term, it remains susceptible to confusion and inconsistency when applied to unambiguous contract terms. The principle's limitations are, however, clear: surrounding facts and circumstances cannot be employed to "make the language say what it unambiguously does not say" or "to show that the parties probably meant, or could have meant, something

___

[1]For that reason, I would not hold, as Skeels urges, that Section 303.004 categorically prohibits a professional corporation from redeeming shares for $0.

3

other than what their agreement stated." In other words, extrinsic evidence may only be used to aid the understanding of an unambiguous contract's language, not change it or "create ambiguity."

> When interpreting a written contract, the prime directive is to ascertain the parties' intent as expressed in the instrument. "[O]bjective, not subjective, intent controls," so the focus is on the words the parties chose to memorialize their agreement. But language is nuanced, and meaning is often context driven. Contract language is thus construed in its lexical environment, which may include objectively determinable facts and circumstances that contextualize the parties' transaction. Surrounding facts and circumstances can inform the meaning of language but cannot be used to augment, alter, or contradict the terms of an unambiguous contract.

*URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 757–58 (Tex. 2018) (citations omitted).

The BOC broadly authorizes a corporation's shareholders to enter into agreements with each other that, if otherwise effective, limit or are inconsistent with other provisions of the BOC. *See* Tex. Bus. Orgs. Code Ann. §§ 21.101,[2] .104 ("A

---

[2]The full text provides,

(a) The shareholders of a corporation may enter into an agreement that:

(1) restricts the discretion or powers of the board of directors;

(2) eliminates the board of directors and authorizes the business and affairs of the corporation to be managed, wholly or partly, by one or more of its shareholders or other persons;

(3) establishes the individuals who shall serve as directors or officers of the corporation;

(4) determines the term of office, manner of selection or removal, or terms or conditions of employment of a director, officer, or other employee of the corporation, regardless of the length of employment;

4

(5) governs the authorization or making of distributions whether in proportion to ownership of shares, subject to Section 21.303;

(6) determines the manner in which profits and losses will be apportioned;

(7) governs, in general or with regard to specific matters, the exercise or division of voting power by and between the shareholders, directors, or other persons, including use of disproportionate voting rights or director proxies;

(8) establishes the terms of an agreement for the transfer or use of property or for the provision of services between the corporation and another person, including a shareholder, director, officer, or employee of the corporation;

(9) authorizes arbitration or grants authority to a shareholder or other person to resolve any issue about which there is a deadlock among the directors, shareholders, or other persons authorized to manage the corporation;

(10) requires winding up and termination of the corporation at the request of one or more shareholders or on the occurrence of a specified event or contingency, in which case the winding up and termination of the corporation will proceed as if all of the shareholders had consented in writing to the winding up and termination as provided by Subchapter K;

(11) with regard to one or more social purposes specified in the corporation's certificate of formation, governs the exercise of corporate powers, the management of the operations and affairs of the corporation, the approval by shareholders or other persons of corporate actions, or the relationship among the shareholders, the directors, and the corporation; or

(12) otherwise governs the exercise of corporate powers, the management of the business and affairs of the corporation, or the relationship among the shareholders, the directors, and the

shareholders' agreement that complies with this subchapter is effective among the shareholders and between the shareholders and the corporation even if the terms of the agreement are inconsistent with this code."), .110 ("This subchapter does not prohibit or impair any agreement between two or more shareholders, or between the corporation and one or more of the corporation's shareholders, permitted by Title 1, this chapter, or other law."); *Ritchie v. Rupe*, 443 S.W.3d 856, 881 (Tex. 2014) ("Importantly, the Legislature has granted corporate founders and owners broad freedom to dictate for themselves the rights, duties, and procedures that govern their relationship with each other and with the corporation.").

---

corporation as if the corporation were a partnership or in a manner that would otherwise be appropriate only among partners and not contrary to public policy.

(b) A shareholders' agreement authorized by this section must be:

(1) contained in:

(A) the certificate of formation or bylaws if approved by all of the shareholders at the time of the agreement; or

(B) a written agreement that is:

(i) signed by all of the shareholders at the time of the agreement; and

(ii) made known to the corporation; and

(2) amended only by all of the shareholders at the time of the amendment, unless the agreement provides otherwise.

Tex. Bus. Orgs. Code Ann. § 21.101 (footnote omitted).

With those principles in mind, I set forth the language of the Resolution in its entirety:

**RESOLUTION**
**02/11/14**

WHEREAS, Friedman, Suder & Cooke, P.C. (the "Firm") desires to ratify, confirm and memorialize in writing a policy and practice of the Firm, and a right possessed by Walker Friedman, Jonathan Suder and Michael Cooke, before any current shareholder other than Walker Friedman, Jonathan Suder and Michael Cooke became a shareholder in the Firm;

WHEREAS, such policy, practice and right is that Walker Friedman, Jonathan Suder and Michael Cooke collectively have been entitled to take affirmative action and veto any vote or action taken by or on behalf of the Firm notwithstanding the number of shareholders, or the number of shares issued to any shareholder;

NOW, THEREFORE, be it resolved as follows:

1. Notwithstanding the number of shareholders, or the number of shares issued to any shareholder, Walker Friedman, Jonathan Suder and Michael Cooke, collectively, have been entitled, and shall continue to be entitled, to take affirmative action on behalf of the Firm, and veto any vote or action taken by or on behalf of the Firm, and/or by any other shareholder, whether individually, or collectively.

Having set forth the language used by the Firm and agreed to by its shareholders, and keeping in mind the principles of freedom of contract embraced in both the common law and the BOC, I now turn to the BOC's specific provisions pertaining to stock redemption.

7

## II. Stock Redemption in Texas

### A. Professional Corporations in General

Before 1960, no state allowed lawyers or other professionals to incorporate, but now all states allow it. Christopher C. Wang, *Breaking Up Is Hard To Do: Allocating Fees From The Unfinished Business Of A Professional Corporation*, 64 U. Chi. L. Rev. 1367, 1372 (Fall 1997). Initially, significant tax advantages attached to the formation of a professional corporation; now, "the primary advantage of the professional corporation is the limited liability it affords to its members." *Id.* at 1372–73; *see also* 20 Tex. Prac. Business Organizations § 24:1 (noting that professional corporations historically developed to benefit from tax-advantageous retirement plans for professionals). Although a professional corporation possesses significant corporate attributes, as a practical matter it often functions as a partnership in the law-firm context, in terms of the relationship among the shareholders and compensation. Wang, *supra*, at 1373–74. Texas law expressly allows this type of management by shareholder agreement. *See* Tex. Bus. Orgs. Code Ann. § 21.101(a)(12).

Professional corporations are addressed specifically in Chapter 303 of the BOC and are subject to the requirements governing professional entities in general set forth in BOC's Title 7, in which Chapter 303 is located. *Id.* §§ 301.001, .003(4), 303.001–.006. But professional corporations are also subject to Titles 1 through 3 of the BOC,

including Chapter 21 governing "for-profit corporations," except to the extent that Chapter 21 conflicts with Title 7. *Id.* §§ 301.002, 303.001. [3]

Shareholders of a professional corporation must be licensed in the "same professional service" rendered by the professional corporation. *Id.* §§ 301.003(5), .004(2), .007(a). If a shareholder loses that status, he must "promptly relinquish" his ownership interest in the entity. *Id.* § 301.008(b). At that time, the professional corporation "shall purchase or cause to be purchased the ownership interest," upon a "price and terms . . . [that] may be provided by the governing documents of the entity or an applicable agreement." *Id.* § 301.008(d). If only one person owns all an entity's outstanding ownership interests, that person can act as a "managerial official or owner" of the entity only for the time it takes to wind up the entity's affairs. *Id.* § 301.008(e). But if a shareholder of a professional corporation with more than one shareholder remains licensed but dies, becomes incompetent or bankrupt, resigns, withdraws, retires, or is expelled from the professional corporation, the entity continues to exist and need not wind up its affairs *Id.* § 303.005. Moreover, no provision in the BOC requires the professional corporation to redeem or repurchase

---

[3]Because the Firm has never been designated a "close" corporation under the BOC (which is defined differently than "closely held corporation"), Subchapter O of Chapter 21, applicable to close corporations only, does not apply here, and I do not discuss it. *See id.* §§ 3.008, 21.701(1), .702(a), .705–.07.

the shares of a departing shareholder who is still licensed to practice the professional services the entity provides.[4]

Texas law comports with other states' laws in this respect, and courts in those states have declined to compel redemption of a licensed, departing shareholder's shares in the absence of a statute, corporate document, or specific agreement requiring such a redemption. *See, e.g.*, *McCormick v. Dunn & Black, P.S.*, 167 P.3d 610, 619 (Wash. Ct. App. 2007) ("The courts do not have the power to make a stock redemption agreement where the parties failed to do so."), *review denied*, 187 P.3d 270 (Wash. 2008); *Corlett, Killian, Hardeman, McIntosh and Levi, P.A. v. Merritt*, 478 So.2d 828, 829–35 (Fla. Dist. Ct. App. 1985), *review denied*, 488 So.2d 68 (Fla. 1986); *Berrett v. Purser & Edwards*, 876 P.2d 367, 371 (Utah 1994) (refusing also to allow potential for disciplinary rules infraction—unethical fee-splitting—to dictate statutory interpretation); *Trittipo v. O'Brien*, 561 N.E.2d 1201, 1204–08 (Ill. App. Ct. 1990), *appeal denied*, 567 N.E.2d 343 (Ill. 1991). *But cf. Vinall v. Hoffman*, 651 P.2d 850, 851 (Ariz. 1982) (holding opposite based on more broadly worded statute that has since been repealed as acknowledged in *Fearnow v. Ridenour, Swenson, Cleere & Evans, P.C.*, 138 P.3d 723, 730 (Ariz. 2006)). Thus, in these states, "[i]f an attorney-shareholder

---

[4]But by not requiring such a redemption, statutory schemes such as Texas's merely kick the can down the road. Under the BOC, if the departing shareholder ever becomes unlicensed, or an unlicensed person later "succeeds to the ownership interest" of the licensed shareholder—such as by inheritance—the professional corporation must "purchase" the shares at a price and on terms "provided by the governing documents of the entity or an applicable agreement." *Id.* § 301.008(c), (d).

10

leaves . . . and nothing in [a corporate document or applicable agreement] provides for an automatic redemption of shares, the attorney may end up holding shares that are valueless because of the lack of a market for them." Wang, *supra*, at 1395; *see Ritchie*, 443 S.W.3d at 885–86 (explaining that shareholder status does not change nature of at-will employment in absence of agreement to the contrary).

Having concluded that the BOC did not require the Firm to redeem Skeels's shares upon terminating his employment, I next consider the extent to which, and on what terms, such a redemption was permissible under the BOC.

### B. Corporate Ownership Interests

A corporation in general may "acquire its own ownership interests, regardless of whether redeemable, and hold the ownership interests as treasury ownership interests or cancel or dispose of the ownership interests." Tex. Bus. Orgs. Code Ann. § 2.101(9). A shareholder of a professional corporation may freely transfer his shares to the entity, another of the entity's shareholders, or another licensed member of the same profession unless the professional corporation has limited the right of transfer in a governing document or "an applicable agreement."[5] *Id.* § 301.009. Any transfer restrictions must be noted on the stock certificate representing the shares or incorporated by reference in the manner provided by Chapter 21. *Id.* § 303.003. *But see*

---

[5]The BOC defines a governing document as the entity's certificate of formation or "the other documents or agreements adopted by the entity . . . to govern [its] formation or . . . internal affairs." *Id.* § 1.002(36)(A). The BOC does not define "applicable agreement."

*id.* § 21.213 (providing that restriction not noted on stock certificate is "specifically enforceable against a person other than a transferee for value from the time the person acquires actual knowledge of the restriction's existence").

A transfer of shares from a shareholder to the entity can be accomplished by repurchase or redemption. "Repurchase involves a willing sale from the shareholder to the corporation" while "[r]edemption . . . involves a forced sale to the corporation." Elliot M. Kaplan & David B. Young, *Corporate "Eminent Domain": Stock Redemption and Reverse Stock Splits*, 57 UMKC L. Rev. 67, 68–69 (1988); *Herring Bancorp, Inc. v. Mikkelsen*, 529 S.W.3d 216, 226 (Tex. App.—Amarillo 2017, pet. denied) (op. on reh'g) (distinguishing redemption—"an involuntary disposition of a security pursuant to a pre-existing agreement or right to acquire (purchase) that security in accordance with the terms and provisions of that agreement or right"—from repurchase—"a voluntary disposition of a security on terms and conditions to be negotiated at the time of the disposition and acquisition"). "A redemption by the corporation of its stock is, in a sense, a repurchase of it for cancellation." Russell Stanley Q. Geronimo, *Unbundled Shares: Circumventing Corporate Nationality Rules Through Swaps, Options, and Other Devices*, 19 Asian-Pac. L. & Pol'y J. 84, 120 (2018); *see* Tex. Bus. Orgs. Code Ann. § 21.251(a), (b). Repurchase can result in unfairness to a minority shareholder if he is not given the same opportunity to dispose of his stock at a price as favorable as a majority shareholder, but the opportunities for abuse are greater with redemption

because of its involuntary nature.[6] *See Herring Bancorp.*, 529 S.W.3d at 223 n.7; Kaplan, *supra*, at 69. Therefore, corporations must strictly comply with stock-redemption related statutes or contract provisions. *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d

---

[6]In discussing the status of a minority shareholder in a closely-held corporation, the Supreme Court of Texas described this potential for abuse thusly:

> [M]inority shareholders in closely held corporations have "no statutory right to exit the venture and receive a return of capital" like partners in a partnership do, and "usually have no ability to sell their shares" like shareholders in a publicly held corporation do; thus, if they fail to contract for shareholder rights, they will be "uniquely subject to potential abuse by a majority or controlling shareholder or group." Unhappy with the situation and unable to change it, they are often unable to extract themselves from the business relationship, at least without financial loss.

> Those in control of a closely held corporation may use various "squeeze-out" or "freeze-out" tactics to deprive minority shareholders of benefits, to misappropriate those benefits for themselves, or to induce minority shareholders to relinquish their ownership for less than it is otherwise worth. The types of conduct most commonly associated with such tactics include (1) denial of access to corporate books and records, (2) withholding payment of, or declining to declare, dividends, (3) termination of a minority shareholder's employment, (4) misapplication of corporate funds and diversion of corporate opportunities for personal purposes, and (5) manipulation of stock values.

> . . . .

> Of course, shareholders may also prevent and resolve common disputes by entering into a shareholders' agreement to govern their respective rights and obligations. Importantly, the Legislature has granted corporate founders and owners broad freedom to dictate for themselves the rights, duties, and procedures that govern their relationship with each other and with the corporation.

*Ritchie*, 443 S.W.3d at 879–81.

687, 703 (Tex. App.—Fort Worth 2006, pet. denied), *disapproved of on other grounds by Ritchie*, 443 S.W.3d at 871 & n.17.

### C. BOC Stock Redemption Applicable to For-Profit Corporations

To fully understand the BOC's applicability to share redemption in professional corporations—i.e., to contextually understand in what ways, if any, that Chapter 303 conflicts with Chapter 21—one must understand the BOC's scheme for stock redemption applicable generally to for-profit corporations. The BOC sets forth redemption procedures for for-profit corporations in Chapter 21. Under that chapter, a for-profit corporation may issue redeemable shares only "if authorized by the corporation's certificate of formation." Tex. Bus. Orgs. Code Ann. § 21.154(a)(1). A corporation may not redeem shares that have not been so designated. *Id.* §§ 21.303, .304(a). Chapter 21 nevertheless gives corporations broad authority to enter into shareholder agreements to govern the corporation "as if [it] were a partnership or in a manner that would otherwise be appropriate only among partners and not contrary to public policy" and to enter into shareholder agreements governing "the authorization or making of distributions." *Id.* §§ 21.101(a)(5) (making a shareholders' agreement on redemption "subject to Section 21.303"), (a)(12), .104 ("A shareholders' agreement that complies with *this subchapter* is effective among the shareholders and between the shareholders and the corporation even if the terms of the agreement are inconsistent with this code." (emphasis added)). Chapter 21 also expressly contemplates a transfer of value—either in the form of a payment or the issuance of indebtedness—when a

14

for-profit corporation redeems shares.[7] *Id.* §§ 21.002(6)(A) (defining a distribution as a "transfer of property, including cash, or issuance of debt, by a corporation to its shareholders in the form of . . . a purchase or redemption, directly or indirectly, of any of its own shares"), § 21.302–.303, .304 ("A distribution by a corporation that involves a redemption of outstanding redeemable shares of the corporation subject to redemption may be related to any or all of those shares."), .308 (providing that corporate indebtedness arising from distribution or issued in a distribution "are at parity with the corporation's indebtedness to its general, unsecured creditors"); *see Redemption*, Black's Law Dictionary (11th ed. 2019) (defining "redemption" as "[t]he act or an instance of reclaiming or regaining possession by paying a specific price" or "[t]he reacquisition of a security by the issuer").

A for-profit corporation's board of directors, or shareholders if acting as the board of directors,[8] may authorize a stock redemption and in doing so must determine "the maximum amount that may be distributed." Tex. Bus. Orgs. Code Ann. § 21.302. But Chapter 21 prohibits a distribution "if the corporation would be insolvent"

---

[7]Section 21.304, entitled "Redemptions," is in the Subchapter entitled, "Distributions and Share Dividends."

[8]Although a corporation ordinarily is managed by a board of directors, *Ritchie*, 443 S.W.3d at 868 n.12, the shareholders may by agreement dispense with the board and manage the corporation through one or more shareholders or manage the corporation "as if [it] were a partnership or in a manner that would otherwise be appropriate only among partners and not contrary to public policy," Tex. Bus. Orgs. Code Ann. § 21.101(a)(2), (12); *see Nolana Open MRI Ctr., Inc. v. Pechero*, No. 13-13-00552-CV, 2015 WL 601916, at *9 (Tex. App.—Corpus Christi–Edinburg Feb. 12, 2015, no pet.) (mem. op.).

afterward or if the distribution would exceed the corporation's surplus. *Id.* §§ 21.301(1)(B), .303(b). The right of a corporation to reacquire its own shares is commonly limited by provisions designed to protect the rights of creditors; thus, statutes frequently provide that a corporation may not acquire its own stock if such an acquisition would reduce its net assets below its stated capital or would render the corporation incapable of paying its debts as they fall due. Kaplan, *supra*, at 70.

Redemption under Chapter 21 takes effect by call and written notice. Tex. Bus. Orgs. Code Ann. § 21.304(c). A redemption notice must include "the redemptive price" set by the board of directors and "the place at which the shareholders may obtain payment of the redemptive price." *Id.* § 21.305(a)(3), (4). If the corporation deposits money with a bank or trust company appointed and acting as the corporation's transfer agent and gives payment instructions according to the statutory procedure, the redemption takes effect on the date of that deposit and giving of payment instructions, unless the corporation's certificate of formation provides otherwise. *Id.* § 21.306. The shareholder has no further right related to the shares other than the right to payment of the distribution amount (or the right to convert the share, if any) upon surrender of the share certificate. *Id.* §§ 21.306(c)–.307.

### D. BOC Stock Redemption for Professional Corporations

In contrast to Chapter 21, Section 303.004 of the BOC specifically addresses redemption of shares by a professional corporation. Section 303.004 provides,

16

(a) A professional corporation may redeem shares of a shareholder, including a deceased shareholder.

(b) The price and other terms of a redemption of shares may be:

(1) agreed to between the board of directors of the professional corporation and the shareholder or the shareholder's personal representative; or

(2) *specified* in the governing documents of the professional corporation or an applicable agreement.

*Id.* § 303.004 (emphasis added). This section thus appears to authorize a professional corporation to redeem shares even if they were not designated as redeemable in its certificate of formation. *Compare id.* §§ 3.007, 303.004, *with id.* §§ 21.303–.304(a). This makes sense in light of Chapter 303's requirement that shares of a no-longer-licensed professional must be repurchased.

Section 303.004 thus sets forth a more expansive ability to redeem professional-corporation stock than does Chapter 21 for for-profit corporations generally. Professional corporations may redeem shares even if those shares are not designated redeemable. But in doing so, Section 303.004(b) provides three ways in which the price and terms of such a redemption can be determined <u>absent an agreement or governing document expressly disclaiming that section's applicability</u>, *see id.* §§ 21.101, .104, .110: (1) as agreed to between the board (or governing person or body) and the departing shareholder, (2) as "specified" in a governing document, or (3) as "specified" in an applicable agreement. Not included in this list is redemption on a price and terms set unilaterally by the board (or governing body or persons),

again absent an agreement or governing document expressly disclaiming Section 303.004's applicability.[9]

**E. Resolution Did Not Expressly Contract Around Section 303.004(b)**

The majority concludes that the Resolution—an agreement between shareholders that allows governance by three members but which does not even mention the BOC or any general or specific requirement of the BOC, much less redemption—is a shareholder agreement sufficient to either comply with or expressly contract around Section 303.004(b)(2), which provides that redemption price and terms—if not agreed to between the board (or governing person or body) and the

---

[9]Not only is this interpretation of Section 303.004(b) in keeping with the general directive to strictly interpret redemption statutes, it also is in keeping with a legislative recognition of the need to provide more flexibility to a professional corporation and its shareholders vis à vis the entry and exit of shareholders as well as to provide some protection for shareholders from the abuses that can occur in closely-held corporations. *See* note 6, *supra*. Moreover, that Section 303.004(b) is intended to contain an exclusive list (again, absent an agreement otherwise), any one of which may be chosen by the professional corporation, is bolstered by Section 301.008(d), which lists only two ways in which the price and terms "may" be set for a repurchase of the ownership interest of a professional entity owner who becomes unlicensed (or the successor to that person's interest): in a governing document or applicable agreement. Tex. Bus. Orgs. Code Ann. § 301.008(d). Both sections indicate that the legislature intended that a professional-entity's shares could not be unilaterally redeemed by the governing body without any input or knowledge of the owner or a specific agreement otherwise. *See generally id.* § 21.105 (allowing stock buyer to rescind purchase if he buys shares without knowledge of valid shareholder agreement's existence).

18

departing shareholder or "specified" in a governing document—may be "specified" in an applicable agreement.[10]

What does the word "specified" mean here? We must interpret statutory words according to their plain meanings and in the context in which they are used, not in isolation. *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019). The term "specified" is not defined in the BOC. Merriam Webster defines "specify" as "to

---

[10]The majority does not appear to embrace the Firm's argument that if Section 303.004 applies to the redemption of Skeels's shares, the Firm nevertheless complied with that section because Section 303.004(b)'s use of "entirely" permissive language— "the price and other terms . . . may be . . . agreed to . . . or . . . specified"—means that professional corporations need only choose whether they want to redeem stock in accordance with that subsection. *See id.* § 303.004(b) (emphasis added). If that were the case, there would be no need for subsection (b)(2); it would be entirely superfluous. Subsection (a) could have simply read "A professional corporation may redeem shares of a shareholder, including a deceased shareholder, on any price and terms determined by the board or governing person." *See Dall. Cty. Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 874 (Tex. 2005) (holding that a statute that uses the word "may" is permissive rather than mandatory unless there is something in the statute to show a legislative intent that "may" is mandatory); *see* Tex. Gov't Code Ann. § 311.016(1). Even though Section 303.004(b) uses the permissive word "may"—when read in context with the larger Chapter 21 and Chapter 303 scheme—it does so only among the three choices specifically described in that subsection. Absent an agreement expressly disclaiming Section 303.004's applicability, Section 303.004(b) does not provide three examples of ways a professional corporation can redeem shares, *but only if it wants to.*

Likewise, it does not appear that the majority's decision turns on the premise that the Resolution somehow dispensed with Section 303.004(b) altogether. Indeed, it cannot. If the Resolution purports to allow the three shareholders to effect share redemption contrary to Section 303.004(b), it allows those three shareholders to take any action contrary to the BOC so long as a majority of those three wish to do so. Construing the Resolution that broadly would eviscerate the purpose and intent of not only Sections 21.101, 21.014, and 21.110 of the BOC but also of the entire BOC provisions applicable to professional corporations.

mention or name in a specific or explicit manner." Webster's Third New Int'l Dictionary 2187 (2002). Thus, to impart any meaning to the Legislature's use of this word, we must construe Section 303.004(b)(2) to mean that—again, absent a statutorily authorized agreement expressly disclaiming its applicability—the price and terms of permitted stock redemption must be expressly mentioned or named in a governing document or applicable agreement to comport with the statute's requirements.

### III. Unambiguous Resolution Does Not Contemplate Share Redemption

With the preceding statutory analysis in mind, I conclude that the Resolution did not contemplate share redemption, much less attempt to comport with or expressly contract around Section 303.004(b)(2). Nothing in the Resolution purports to allow the shareholders in general—or only Friedman, Suder, and Cooke collectively—to take action inconsistent with any specific provision of the BOC or the BOC in general, nor does it evidence an intent that the Firm as an entity would not be bound by any particular BOC provision, including Section 303.004. Nothing in it specifically—or even generally—addresses redemption. By its own terms, the Resolution shows nothing more than an intent that any affirmative action that could be taken by the Firm would be decided by Friedman, Suder, and Cooke collectively and that those three could veto any action or purported action taken by any other shareholders or group of shareholders on the Firm's behalf. While the language of the Resolution gives Friedman, Suder, and Cooke broad powers vis à vis the other firm

shareholders, in no way does it purport to allow those three to take any action they decide to take contrary to the BOC or any other law. The majority's holding would extend the language of the Resolution to embrace any of the twelve listed actions in Section 21.101—or any other BOC provision—without specific reference. This would certainly appear to conflict with that section's requirement that such an agreement be made known to the shareholders. How could they "know" what the agreement encompasses when it conceivably could apply to any provision of the BOC? At some point, a document that means "everything" really means nothing.

The Resolution itself is general and does not "specify" any topic in particular other than ultimate governance of the firm by Friedman, Suder, and Cooke collectively; not only does it not specify a particular price and terms of redemption,[11] it also does not purport to expressly allow the three controlling shareholders to unilaterally set the price and terms of share redemption. Cooke admitted at the temporary injunction hearing that the Resolution did not specify that the Firm could redeem a shareholder's shares for $0, but in his opinion, it was "intended to give . . . discretion broad enough to encompass things like that." But general discretion does not equate to a specific or explicit description. And we cannot consider the parties' subjective intent in construing the Resolution. *See URI*, 543 S.W.3d at 769.

---

[11]This is not to say that I would hold that an applicable agreement must name a specific price and terms of share redemption to comport with Section 303.004(b)(2); however, it should at least purport to mention redemption, e.g., "The price and terms of share redemption shall be solely at the discretion of the corporation's governing persons."

The Firm urges that the surrounding circumstances of the execution of the Resolution support a conclusion that by evidencing the shareholders' intention that Friedman, Suder, and Cooke retain the "sole ability to control firm operations," the Resolution also shows an intention that those three persons could redeem already issued stock on any price and terms they decided. But I conclude the opposite. In a pre-audit (and therefore pre-Resolution) "[u]pdate" memorandum to Friedman, Suder, Cooke, Skeels, and another shareholder, the Firm's office manager noted the following:

> In the meantime, we have some work to do with respect to our record keeping. We must have these items by February 12 and [the Firm's accountant] stressed that they are critically important.
>
> • Purchase a stock book and issue the stock correctly. Different ink, different signors, correct dates, etc. Show voided stock for partners who left the firm. Create stock for newer partners.[12]
>
> • Do minutes for missing years - one set of minutes per year for the annual meeting is fine. Include things like compensation discussions, tornado, [a former shareholder] leaving the firm, adding new partners, NBC leaving, moving to new space, moving to current space - anything that might have happened in a particular year. Short and sweet is fine. Use different fonts, different minute styles/formats, have different partners sign using different colors of ink. Maybe different types of paper. *The IRS wants to see that we are a real corporation acting like a real corporation.* Back date.
>
> • A seal is not necessary, but you might want to purchase/use a stamp with our current name.

[Emphasis added.]

---

[12]Skeels's stock was issued in conjunction with the audit.

Thus, the Resolution was entered into against a backdrop of a need to properly document decisions that had already been made and to show adherence to corporate formalities. This comports with—and does not do violence to—a conclusion that the Resolution's plain language shows that it relates solely to the relationship among the shareholders vis à vis the taking of action that the Firm was authorized to make but that it did not purport to authorize Friedman, Suder, and Cooke individually to take any action inconsistent with the BOC, including Section 303.004.

The disclaimer of preemptive rights of shareholders has no bearing on this analysis. Whether the governing persons could issue or dispose of unissued stock without invoking a purchase right for the other shareholders does not inform on what terms the governing persons could redeem shares once issued. *See Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) ("We also recognize the insight of commentators who have long maintained that stock sales do not invoke preemptive rights.").

I end with this general observation. Although I agree with the decision to overturn the trial court's sanctions award, I do not think this holding should be taken to mean that I (or this court, for that matter) condone this litigation in general. Regardless of the correctness of the parties' legal positions, or the fact that good-faith arguments could be made in support of the pleadings, it does appear to have been undertaken with a purpose beyond the recovery of simple damages, which appear from the beginning to have had little likelihood of recovery in an amount that would

23

justify this suit's protracted nature. Likewise, the situation was not improved by the attempt to force cancellation of shares that were not required by law to be redeemed so that an inactive shareholder would arguably have no legal right to access books and records that would have likely confirmed the potentially minimal damage recovery. I remain disappointed that the parties were not able to resolve the matter in mediation although I recognize that by the time the dispute reached this court, settlement was an unlikely possibility.

With those concluding comments and for the foregoing reasons, I would deny the Firm's motion for further rehearing; grant Skeels's motions for further rehearing and en banc reconsideration; reverse the trial court's judgment on the competing declaratory-judgment claims, and attorney's fees and sanctions awards; and remand this case to the trial court for further proceedings.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: October 14, 2021